# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| (1) MUSCOGEE (CREEK) NATION,<br>    a federally recognized Indian tribe,<br><br>    *Plaintiff*,<br><br>v.<br><br>(1) CITY OF HENRYETTA, OKLAHOMA,<br>(2) JOHN INSABELLA, in his official<br>    capacity as City Attorney for the City of<br>    Henryetta.<br><br>    *Defendants*. | Case No. 25-cv-00227-GLJ |

## MOTION OF THE MUSCOGEE (CREEK) NATION FOR A PRELIMINARY INJUNCTION AND OPENING BRIEF IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

I.      Allocation of Criminal Jurisdiction on the Creek Reservation............................................2

II.     The City's Continued Claims to Criminal Jurisdiction over Indians Within the
        Creek Reservation After *McGirt* ..................................................................................3

ARGUMENT .....................................................................................................................5

I.      The Nation Has Standing To Bring This Action. ................................................................5

II.     The Nation Amply Satisfies the Four-Factor Test for a Preliminary Injunction.................5

        A.      The Nation Is Likely To Succeed on the Merits. ........................................6

                1.      Under Controlling Supreme Court and Tenth Circuit
                        Precedent, States Lack Criminal Jurisdiction over Indians in
                        Indian Country Absent Congressional Assent.................................6

                2.      The Presumptive Rule Against State Criminal Jurisdiction
                        Over Indians in Indian Country Is Grounded in Congress's
                        Exclusive Authority over Indian Affairs. .....................................10

                3.      Subjective Judicial Balancing Cannot Be Substituted for the
                        Constitutional Design and Congress's Will. .................................13

        B.      The Nation Will Suffer Irreparable Harm Absent Injunctive Relief......................19

        C.      The Balance of Harms and the Public Interest Favor Injunctive Relief................23

CONCLUSION..................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*,
　521 U.S. 203 (1997) ........................................................................................................ 9

*Baker v. USD 229 Blue Valley*,
　979 F.3d 866 (10th Cir. 2020) ...................................................................................... 5

*Bosse v. Oklahoma*,
　580 U.S. 1 (2016) ............................................................................................................ 9

*Bryan v. Itasca County*,
　426 U.S. 373 (1976) ................................................................................................ 16, 18

*Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma*,
　618 F.2d 665 (10th Cir. 1980) ...................................................................................... 7

*County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*,
　502 U.S. 251 (1992) ........................................................................................................ 8

*Crawford v. Washington*,
　541 U.S. 36 (2004) ........................................................................................................ 15

*Dear v. Nair*,
　No. 21-2124, 2022 WL 2165927 (10th Cir. June 16, 2022) ...................................... 6

*Denver Homeless Out Loud v. Denver*,
　32 F.4th 1259 (10th Cir. 2022) .................................................................................... 5

*Department of Revenue of Kentucky v. Davis*,
　553 U.S. 328 (2008) ................................................................................................ 15, 17

*District of Columbia v. Heller*,
　554 U.S. 570 (2008) ...................................................................................................... 14

*Draper v. United States*,
　164 U.S. 240 (1896) ........................................................................................................ 8

*Ex parte Crow Dog*,
　109 U.S. 556 (1883) ........................................................................................................ 6

*Federal Trade Commission v. Elite IT Partners, Inc.*,
　91 F.4th 1042 (10th Cir. 2024) .................................................................................... 9

*Fisher v. District Court for the Sixteenth Judicial District of Montana*,
　424 U.S. 382 (1976) ...................................................................................................... 21

*Garcia v. San Antonio Metropolitan Transit Authority,*
    469 U.S. 528 (1985) ........................................................................................ 12

*Gonzaga University v. Doe,*
    536 U.S. 273 (2002) ........................................................................................ 13

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ........................................................................................ 10

*Hagen v. Utah,*
    510 U.S. 399 (1994) .......................................................................................... 7

*Kennerly v. District Court for the Ninth Judicial District of Montana,*
    400 U.S. 423 (1971) ........................................................................................ 16

*Lakey v. City of Wilson,*
    Case No. CIV-20-152-RAW, 2024 WL 2221675 (E.D. Okla. May 16, 2024) .......................... 7

*Luis v. United States,*
    578 U.S. 5 (2016) ........................................................................................... 15

*Mallory v. Norfolk Southern Railway Co.,*
    600 U.S. 122 (2023) .......................................................................................... 9

*Maricopa County v. Valley National Bank of Phoenix,*
    318 U.S. 357 (1943) ........................................................................................ 12

*McClanahan v. State Tax Commission of Arizona,*
    411 U.S. 164 (1973) ...................................................................................... 7, 18

*McGirt v. Oklahoma,*
    591 U.S. 894 (2020) .................................................................................. passim

*Michigan v. Bay Mills Indian Community,*
    572 U.S. 782 (2014) ........................................................................................ 17

*Nevada v. Hicks,*
    533 U.S. 353 (2001) .......................................................................................... 9

*New Jersey v. Portash,*
    440 U.S. 450 (1979) ........................................................................................ 15

*New York ex rel. Cutler v. Dibble,*
    62 U.S. 366 (1858) ........................................................................................... 8

*New York ex rel. Ray v. Martin,*
    326 U.S. 496 (1946) .......................................................................................... 8

*Oklahoma v. Castro-Huerta,*
   597 U.S. 629 (2022) ................................................................................................ passim

*Organized Village of Kake v. Egan,*
   369 U.S. 60 (1962) .......................................................................................................... 9

*Parker Drilling Management Services, Ltd. v. Newton,*
   587 U.S. 601 (2019) ...................................................................................................... 18

*Pollard v. Hagan,*
   44 U.S. 212 (1845) ................................................................................................... 11, 12

*Prairie Band of Potawatomi Indians v. Pierce,*
   253 F.3d 1234 (10th Cir. 2001) ................................................................................ passim

*Prairie Band Potawatomi Nation v. Wagnon,*
   476 F.3d 818 (10th Cir. 2007) ............................................................................... 14, 25

*Puerto Rico v. Sanchez Valle,*
   579 U.S. 59 (2016) .......................................................................................................... 6

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
   490 U.S. 477 (1989) ........................................................................................................ 9

*Ross v. Neff,*
   905 F.2d 1349 (10th Cir. 1990) ..................................................................................... 7

*Seminole Tribe of Florida v. Florida,*
   517 U.S. 44 (1996) ................................................................................................... 11, 15

*Seneca-Cayuga Tribe v. Oklahoma ex rel. Thompson,*
   874 F.2d 709 (10th Cir.1989) ...................................................................................... 23

*Shinn v. Ramirez,*
   596 U.S. 366 (2022) ........................................................................................................ 9

*Skiriotes v. Florida,*
   313 U.S. 69 (1941) ........................................................................................................ 11

*Strain v. Regalado,*
   977 F.3d 984 (10th Cir. 2020) ....................................................................................... 9

*Sturges v. Crowninshield,*
   17 U.S. (4 Wheat.) 122 (1819) .................................................................................... 12

*Surplus Trading Co. v. Cook,*
   281 U.S. 647 (1930) ........................................................................................................ 9

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering*,
    476 U.S. 877 (1986) ................................................................................................... 16, 17

*Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*,
    460 U.S. 533 (1983) ........................................................................................................... 9

*Toch, LLC v. City of Tulsa*,
    474 P.3d 859 (Okla. 2020) ................................................................................................. 6

*Torres v. Texas Department of Public Safety*,
    597 U.S. 580 (2022) ......................................................................................................... 12

*U.S. Term Limits, Inc. v. Thornton*,
    514 U.S. 779 (1995) ......................................................................................................... 12

*United States v. Comstock*,
    560 U.S. 126 (2010) ......................................................................................................... 12

*United States v. Daniels*,
    Case No. CR-23-209-RAW, 2024 WL 2275237 (E.D. Okla. May 20, 2024) ...................... 10

*United States v. Iski*,
    Case No. 24-CV-0493-CVE, 2025 WL 1088811 (E.D. Okla. Apr. 9, 2025)........................... 5

*United States v. Lara*,
    541 U.S. 193 (2004) ............................................................................................... 10, 13, 14

*United States v. Maloid*,
    71 F.4th 795 (10th Cir. 2023) ............................................................................................ 9

*United States v. McBratney*,
    104 U.S. 621 (1881) ............................................................................................... 8, 12, 13

*United States v. Sands*,
    968 F.2d 1058 (10th Cir. 1992) ......................................................................................... 7

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*,
    22 F.4th 892 (10th Cir. 2022) .......................................................................................... 13

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
    790 F.3d 1000 (10th Cir. 2015) ................................................................................. passim

*Wagnon v. Prairie Band Potawatomi Nation*,
    546 U.S. 95 (2005) ............................................................................................................ 14

*Washington v. Confederated Bands and Tribes of Yakima Indian Nation*,
    439 U.S. 463 (1979) ......................................................................................................... 16

*White Mountain Apache Tribe v. Bracker*,
   448 U.S. 136 (1980) ................................................................................. 8, 13, 14

*Williams v. Lee*,
   358 U.S. 217 (1959) ......................................................................................... 7

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................. 5

*Wyandotte Nation v. Sebelius*,
   443 F.3d 1247 (10th Cir. 2006) ................................................................ 19, 20

**Constitutional Provisions, Statutes, and Legislative Materials**

18 U.S.C. § 3243 ...................................................................................................... 16

Act of Apr. 11, 1968, Pub. L. No. 90-284, 82 Stat. 73........................................ 16, 17

Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588................................. 16, 17, 18

Act of July 2, 1948, ch. 809, 62 Stat. 1224.............................................................. 16

Act of June 30, 1948, ch. 759, 62 Stat. 1161 ........................................................... 16

Act of May 31, 1948, ch. 279, 60 Stat. 229 ............................................................. 16

Act of Oct. 5, 1949, ch. 604, 63 Stat. 705................................................................ 16

H.R. Rep. No. 83-848 .......................................................................................... 16, 18

MCN Code tit. 14........................................................................................................ 19

MCN Code tit. 16........................................................................................................ 19

MCN Code tit. 27........................................................................................................ 19

MCN Const. art. VII ................................................................................................... 19

U.S. Const. amend. X............................................................................................ 11, 12, 14

**Other Authorities**

Chloe Abbott, *Okmulgee Police, Muscogee Lighthorse Sign Cross-Commission
   Agreement*, News on 6 (Aug. 13, 2024)............................................................ 24

City of Coweta, *City Manager's Monthly Report* (Mar. 2025).................................. 24

*Cohen's Handbook of Federal Indian Law* § 6.03 (Nell Jessup Newton ed., 2012) ............... 7, 13

District 22 Drug and Violent Crimes Task Force, Facebook (June 20, 2024) ............................. 24

Jake Carey [Wagoner County Sheriff's Office], Facebook (Sept. 20, 2024)................................ 24

Kailey Carnine, *Muscogee Nation and Coweta Police Celebrate Beneficial Partnership*, Fox23 News (Jan. 31, 2025) ........................................................................................ 24

Muscogee Nation Lighthorse Police Department, *Office of the Attorney General Certificate of Appreciation*, Facebook (Mar. 10, 2025) ............................................................ 24

Restatement of the Law of American Indians § 71 ........................................................................ 7

U.S. Attorney's Office, Eastern District of Oklahoma, *McIntosh County Resident Sentenced for Causing Death by Firearm During a Crime of Violence* (Aug. 30, 2024).......... 24

U.S. Attorney's Office for the Northern District of Oklahoma, *Operation Clean Sweep II Indicts More than 25 Child Predators and Checked-in on More than 525 Sex Offenders*, Facebook (July 23, 2024) ...................................................................................................... 24

## INTRODUCTION

The Muscogee (Creek) Nation ("Nation") respectfully moves this Court for a preliminary injunction prohibiting the City of Henryetta, Oklahoma, and its City Attorney, John Insabella (collectively the "City" or "Henryetta"), from asserting criminal jurisdiction over Muscogee (Creek) Nation citizens and other Indians within the boundaries of the Muscogee (Creek) Reservation. Pursuant to the United States Constitution and well-established precedent, Oklahoma and its political subdivisions may exercise criminal jurisdiction over Indians within the Reservation only with the assent of Congress. *McGirt v. Oklahoma*, 591 U.S. 894, 928–29 (2020); *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1004 (10th Cir. 2015). "Nor has Congress ever passed a law conferring jurisdiction on Oklahoma." *McGirt*, 591 U.S. at 932.

The City nevertheless continues to prosecute Creek citizens and other Indians for conduct within the Creek Reservation. As evidenced by the declarations accompanying this motion, it is doing so in brazen disregard of the rights of the Nation and its members. To the extent the City seeks to justify its unlawful conduct by reference to the Supreme Court's decision in *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), that argument fails. *Castro-Huerta* repeatedly disclaims any intent to address state criminal jurisdiction over Indians in Indian country. *See, e.g.*, *id*. at 650 n.6 ("We express no view on state jurisdiction over a criminal case of that kind."). It instead confines its holding to state jurisdiction over non-Indians, which it upholds as a matter of state power reserved by the Tenth Amendment—and it is well-settled that the Tenth Amendment reserves to states no measure of criminal jurisdiction over Indians in Indian country. The Nation accordingly has a strong likelihood of success on the merits of this suit.

The other preliminary injunction criteria are likewise satisfied here. The City's unlawful assertion of criminal jurisdiction over Creek citizens and other Indians within the Creek

Reservation irreparably harms the Nation's right of self-government, as repeated decisions of the Tenth Circuit and the facts on the ground here confirm. Permitting the City to continue asserting such jurisdiction during the pendency of this action would only compound that harm. And Tenth Circuit precedent again confirms that the balance of the equities and the public interest weigh decisively in favor of enjoining Henryetta to comply with bedrock federal law.

## BACKGROUND

### I.    Allocation of Criminal Jurisdiction on the Creek Reservation

In *McGirt*, the Supreme Court affirmed that in treaties entered between 1832 and 1866, Congress established a federally protected Indian reservation for the Nation in what is now Eastern Oklahoma, 591 U.S. at 899–902, and that because Congress has never disestablished the Reservation, it remains Indian country today, *id*. at 902–913. Accordingly, *McGirt* held that the settled rules governing federal, state, and tribal criminal jurisdiction within Indian country govern within the Creek Reservation. These include the cardinal principle that "a clear expression of the intention of Congress" is required before states or their political subdivisions "may try Indians for conduct on their lands." *Id*. at 929 (citation omitted); *see also, e.g.*, *Ute Indian Tribe*, 790 F.3d at 1004 (absent congressional authorization, "states possess no authority to prosecute Indians for offenses in Indian country." (quotation marks omitted)). *McGirt* held, moreover, that "Oklahoma cannot come close" to establishing that Congress has authorized it to exercise criminal jurisdiction over Indians within the Creek Reservation. 591 U.S. at 929. In sum, because the Creek Reservation is Indian country, "the State has no right to prosecute Indians for crimes committed … [there]. Responsibility to try these matters … fall[s] instead to the federal government and Tribe." *Id*. at 899.

## II.    The City's Continued Claims to Criminal Jurisdiction over Indians Within the Creek Reservation After *McGirt*

Since the Supreme Court's decision in *McGirt*, the City has continued to assert criminal jurisdiction over enrolled Creek Nation citizens for traffic-related and other conduct occurring within the Creek Reservation. It has done so on multiple occasions of which the Nation is aware, including four that are described in sworn declarations accompanying this motion.[1]

In each of those instances, a Creek citizen was stopped or approached by a Henryetta police officer within the boundaries of the Creek Reservation. In each case, the individual informed the officer of his or her Indian status and Creek citizenship, and in two of the cases, the individual showed (or offered to show) his or her tribal enrollment identification card to the officer. In each case, the individual was informed by the officer, municipal court staff, and/or a Henryetta municipal judge that, in the City's view, it enjoys jurisdiction over all Indians within the Creek Reservation and tribal citizenship is therefore irrelevant.[2]

The City has accordingly ticketed or cited all four Creek citizens and subjected them to significant financial penalties and related hardships, including, in three cases, arrest or incarceration.[3] One had his vehicle impounded on the spot and had to walk home on a winter night without adequate clothing.[4] Another likewise had her vehicle impounded and was unable to retrieve it from the City for more than one month, which has significantly impacted her ability to travel to Tulsa for critical pancreatic and colon cancer treatment.[5]

None of this is necessary for public safety. The Nation has in place sixty-seven cross-deputization agreements with numerous non-Indian jurisdictions within the Reservation,

---

[1] Declarations of Daniel L. Bear, Darious Tiger, Brandy Hill, and Heather Rodgers.
[2] Bear Decl. ¶ 3; Tiger Decl. ¶¶ 2, 4; Hill Decl. ¶¶ 3, 6; Rodgers Decl. ¶ 2.
[3] Bear Decl. ¶ 6; Rodgers Decl. ¶ 5; Hill Decl. ¶ 3.
[4] Tiger Decl. ¶ 3.
[5] Rogers Decl. ¶ 7.

3

including: the State of Oklahoma and various State agencies (including the State Highway Patrol); Oklahoma counties and municipalities; and federal agencies, including the United States Bureau of Indian Affairs, the United States Marshals, and the FBI Safe Trails Taskforce. Decl. of Deputy Att'y General Geraldine Wisner ¶ 14. Under such agreements, all cross-deputized officers, tribal and non-tribal, possess arrest authority within the Reservation over all persons within their respective jurisdictions, Indian and non-Indian alike. *Id.* ¶¶ 13, 16. This arrest authority extends to all applicable tribal law and non-tribal law offenses, including state and municipal offenses, and specifically including traffic offenses. *Id.* ¶¶ 16–17, 22. If an arrest or stop is made by a cross-deputized officer of a jurisdiction without ultimate prosecutorial authority, the case is then referred to the jurisdiction possessing that authority. *Id.* ¶¶ 16, 22.

With such an agreement in place between Henryetta and the Nation, Henryetta police officers would possess full lawful authority to stop, detain, or arrest Creek Citizens and other Indians within the Creek Reservation and to refer them to the Nation and the Nation's Lighthorse Police for processing and prosecution. *Id.* ¶ 22. Additionally, Lighthorse Police have demonstrated their willingness and capacity to work closely with police officers from Henryetta and other jurisdictions in responding to incidents in the field and are regularly lauded by other jurisdictions for those collaborations. *Id.* ¶¶ 10, 20, 23. Yet Henryetta has rejected the Nation's repeated offers to enter into a cross-deputization agreement, *id.* ¶ 18, and its Chief of Police has directed the City's law enforcement officers not to contact the Nation or the Nation's Lighthorse Police under any circumstances, *id.* ¶ 20. The City has instead elected to unilaterally prosecute Creek citizens despite the crystal-clear admonitions of the Supreme Court and the Tenth Circuit in *McGirt* and *Ute Indian Tribe* that such prosecutions violate long-settled federal law and irreparably harm the Nation's sovereignty.

4

## ARGUMENT

**I.    The Nation Has Standing To Bring This Action.**

Standing requires "(1) … an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020) (citation omitted). These requirements are readily satisfied here. The City continues to prosecute Creek citizens for conduct within the Creek Reservation in the wake of *McGirt*. *See supra* pp. 3–4. The Tenth Circuit has repeatedly found such conduct by non-tribal governments to unlawfully interfere with tribal self-government. *Infra* pp. 19–23. Because a decision in the Nation's favor would end that interference, Article III standing obtains. *See, e.g.*, *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1242 (10th Cir. 2001) (holding that unauthorized state jurisdiction over Indians within Indian country is an "infringement on tribal self-government" and that the "[p]rotection of that right is the foundation of federal Indian law; accordingly, … the tribe has standing"); *United States v. Iski*, Case No. 24-CV-0493-CVE, 2025 WL 1088811, at *2–3 (E.D. Okla. Apr. 9, 2025) (holding that state jurisdiction over Indians in Indian country implicates tribal interests in sovereignty and self-government and that "Indian tribes, like states and other governmental entities, have standing to sue to protect sovereign interests").

**II.    The Nation Amply Satisfies the Four-Factor Test for a Preliminary Injunction.**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of [the requested] relief, that the balance of equities tips in his favor, and that [the relief] is in the public interest." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Each of these factors weighs strongly in favor of the issuance of a preliminary injunction here.

5

A.       **The Nation Is Likely To Succeed on the Merits.**

Oklahoma municipalities' powers are "derived *solely*" from Oklahoma. *Dear v. Nair*, No.

21-2124, 2022 WL 2165927, at *2 (10th Cir. June 16, 2022) (citation omitted); *see also Toch,*

*LLC v. City of Tulsa*, 474 P.3d 859, 866 (Okla. 2020) ("Municipalities possess and can exercise

only those powers expressly or impliedly granted by the state."). This includes their powers of

criminal prosecution. *See Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 75 (2016). Thus, if

Oklahoma lacks jurisdiction to prosecute Creek citizens and other Indians for conduct arising

within the Creek Reservation, then so does Henryetta—and that is the case here.

1.       **Under Controlling Supreme Court and Tenth Circuit Precedent,**
         **States Lack Criminal Jurisdiction over Indians in Indian Country**
         **Absent Congressional Assent.**

State criminal jurisdiction over Indians in Indian country is foreclosed absent express

authorization by Congress. *McGirt*, drawing on long-settled precedent, reaffirmed that "[s]tate

courts generally have no jurisdiction to try Indians for conduct committed in Indian country,"

591 U.S. at 898 (quotation marks omitted), such that "'a clear expression of the intention of

Congress'" is required before states "may try Indians for conduct on their lands," *id.* at 929

(quoting *Ex parte Crow Dog*, 109 U.S. 556, 572 (1883)); *see also id*. at 899 (if the Creek

Reservation is Indian country, "the State has no right to prosecute Indians for crimes committed

[there]"). These holdings underpinned the Court's judgment that Oklahoma's conviction of Jimcy

McGirt, a Seminole Indian who had committed his crimes on the Creek Reservation, had to be

vacated for lack of state criminal jurisdiction.[6]

---

[6] The *McGirt* dissenters did not dispute that states lack criminal jurisdiction over Indians in
Indian country absent express congressional authorization, *see* 591 U.S. at 938–73 (Roberts, C.J.,
dissenting). They simply contended that Congress had, in fact, granted Oklahoma that
authorization by "a series of statutes[.]" *Id*. at 951.

*McGirt* is just the latest in a long line of cases confirming that "when Congress has wished" states to enjoy criminal authority over Indians in Indian country, "it has expressly granted them the jurisdiction," *Williams v. Lee*, 358 U.S. 217, 221 (1959); *see, e.g.*, *Hagen v. Utah*, 510 U.S. 399, 408, 421 (1994) (because "Congress has not granted criminal jurisdiction to the State of Utah to try crimes committed by Indians in Indian country," Utah's prosecution of an Indian was permissible only because the locus of the crime was "not in Indian country"); *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 178 (1973) (unless exercised pursuant to a grant by Congress, states lack "criminal jurisdiction over reservation Indians").

The Tenth Circuit has followed suit. In *Ute Indian Tribe*, it held that "unless Congress provides an exception to the rule—and it hasn't here—states possess 'no authority' to prosecute Indians for offenses in Indian country," 790 F.3d at 1004 (quoting *Cheyenne-Arapaho Tribes of Okla. v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980)), and accordingly, the State and local governmental entities had "no legal entitlement" to prosecute an Indian for an Indian country traffic offense, *id.* at 1007; *see also, e.g.*, *United States v. Sands*, 968 F.2d 1058, 1061–63 (10th Cir. 1992) (finding Oklahoma had no criminal jurisdiction over Indian in Indian country because it lacked congressional authorization); *Ross v. Neff*, 905 F.2d 1349, 1352–53 (10th Cir. 1990) (same).[7] These Supreme Court and Tenth Circuit precedents are controlling here. *See Lakey v. City of Wilson*, Case No. CIV-20-152-RAW, 2024 WL 2221675, at *3 (E.D. Okla. May 16, 2024) ("[T]his Court is bound by both Supreme Court and Tenth Circuit precedent[.]").

---

[7] Authoritative treatises likewise recognize the same long-settled rule. *See, e.g.*, *Cohen's Handbook of Federal Indian Law* § 6.03[1][a], at 513 (Nell Jessup Newton ed., 2012) ("*Cohen's*") ("State judicial jurisdiction over Indian tribes and tribal members in Indian country is subject to the … general rule precluding that authority in the absence of express authorization by treaty or statute."); Restatement of the Law of American Indians § 71 cmt. b ("Absent federal authorization, states have no jurisdiction over crimes committed by an Indian in Indian country.").

Henryetta may argue that the Supreme Court's decision in *Castro-Huerta* provides a basis for this Court to depart from those precedents, but it does not. *Castro-Huerta* involved a challenge to Oklahoma's prosecution of a non-Indian for a crime against an Indian on the Cherokee Reservation. The Court held that, under the Tenth Amendment, states retain criminal jurisdiction over non-Indians for such crimes unless preempted by federal law. 597 U.S. at 636–38. It rejected the defendant's statutory preemption arguments and then applied the test set forth in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), to conclude that the balance of federal, state, and tribal interests weighed in favor of state jurisdiction, 597 U.S. at 638–51, in part because "a state prosecution of a non-Indian does not involve the exercise of state power over any Indian," *id*. at 650.

*Castro-Huerta* in no way purports to overrule the Court's holding just two Terms earlier in *McGirt* that, absent congressional assent, states and their political subdivisions lack criminal authority over *Indians*. To the contrary, it expressly and repeatedly disclaims any intent to reach that issue. *See, e.g.*, *id*. at 639 n.2 (describing state jurisdiction "over crimes committed by Indians in Indian country" as "a question not before us"); *id.* at 650 n.6 ("We express no view on state jurisdiction over a criminal case of that kind."). The decision indeed refers to state jurisdiction over crimes by non-Indians as "the narrow jurisdictional issue in this case" and distinguishes it from the question of state jurisdiction "over other crimes committed in Indian country, such as crimes committed by Indians," *id*. at 648.[8]

---

[8] In line with these clear disclaimers, not one of the eight cases *Castro-Huerta* cites for the "overarching jurisdictional principle dating back to the 1800s" on which it rests its holding, 597 U.S. at 637, involves state criminal jurisdiction over an Indian in Indian country. *See* 597 U.S. at 636–38 (citing *New York ex rel. Cutler v. Dibble*, 62 U.S. 366, 370 (1858) (non-Indian conduct); *Cnty. of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 257–58 (1992) (same); *United States v. McBratney*, 104 U.S. 621, 621 (1881) (same); *Draper v. United States*, 164 U.S. 240, 241 (1896) (same); *New York ex rel. Ray v. Martin*, 326 U.S. 496,

In light of *Castro-Huerta*'s "aggressively limiting language" disclaiming any intent to reach the issue of state criminal jurisdiction over Indians, lower courts are "foreclosed" from extending it beyond those limits to depart from prior Court precedent, *Shinn v. Ramirez*, 596 U.S. 366, 387 (2022). Indeed, the Supreme Court has stated repeatedly that its "decisions remain binding precedent until we see fit to reconsider them," *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (citation omitted). "Until that occurs, [prior precedent] is the law," *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983), "even if the lower court thinks the [prior] precedent is in tension with" a later Supreme Court decision, *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (lower courts must follow prior precedent, "leaving to this Court the prerogative of overruling its own decisions"); *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (lower courts should not conclude that "our more recent cases have, by implication, overruled an earlier precedent"); *United States v. Maloid*, 71 F.4th 795, 808, 809 (10th Cir. 2023) (discussing same principles and stating that "[w]e heed the Court's command and continue to apply Supreme Court cases that directly control" because if newer Supreme Court precedent "didn't overrule" older precedent, "we are bound to follow the older precedent").

These principles apply equally to Circuit precedents such as *Ute Indian Tribe*, which "remain good law unless the Supreme Court has *indisputably and pellucidly* abrogated them," *Fed. Trade Comm'n v. Elite IT Partners, Inc.*, 91 F.4th 1042, 1051 (10th Cir. 2024) (emphasis added) (quotation marks omitted), *cert. denied*, 145 S. Ct. 150 (2024); *see also, e.g.*, *Strain v. Regalado*, 977 F.3d 984, 993 (10th Cir. 2020) (where later Supreme Court decision did not

---

498 (1946) (same); *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 62 (1962) (off-reservation Indian conduct); *Nevada v. Hicks*, 533 U.S. 353, 355 (2001) (same); *Surplus Trading Co. v. Cook*, 281 U.S. 647, 649–50 (1930) (non-Indian property in military reserve).

"pronounce its application" to an issue, court cannot hold that it overruled prior Tenth Circuit "precedent on this issue" by implication); *United States v. Daniels*, Case No. CR-23-209-RAW, 2024 WL 2275237, at *2 (E.D. Okla. May 20, 2024) (absent "clear abrogation" by a subsequent Supreme Court decision, Tenth Circuit precedents "remain good law and are binding on this Court" (quotation marks omitted)).

Far from clearly abrogating any prior Supreme Court or Tenth Circuit precedents addressing state criminal jurisdiction over Indians, *Castro-Huerta* "express[es] *no view* on state jurisdiction over a criminal case of that kind." 597 U.S. at 650 n.6 (emphasis added). Accordingly, the rule upheld in *McGirt* and *Ute Indian Tribe* that states and their political subdivisions presumptively lack criminal authority over Indians in Indian country controls. And as *McGirt* makes clear, Oklahoma and its political subdivisions "cannot come close" to establishing that Congress has ever provided such authorization. 591 U.S. at 929.

> **2.    The Presumptive Rule Against State Criminal Jurisdiction Over Indians in Indian Country Is Grounded in Congress's Exclusive Authority over Indian Affairs.**

The requirement of express congressional assent before states may assert criminal jurisdiction over Indians in Indian country arises from two related constitutional principles.

<u>First</u>, as the Supreme Court underscored just two Terms ago: "In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as plenary and exclusive." *Haaland v. Brackeen*, 599 U.S. 255, 272 (2023) (quotation marks omitted) (collecting cases). That exclusive "power to legislate with respect to Indians … includ[es] criminal law," *id*. at 275, extends to "Indians as individuals," *id*. at 278, and derives squarely from the Constitution, *see id.* at 273–74 (locating the grant of exclusive federal "authority to regulate Indians" in various constitutional provisions); *see also United States v. Lara*, 541 U.S. 193, 200 (2004) ("the Constitution grants Congress broad general powers to legislate in respect

10

to Indian tribes" that are "plenary and exclusive" (citation omitted)). In sum, the Constitution accomplished "a grant of authority to the Federal Government at the expense of the States" that places Indians in Indian country "under the exclusive control of the Federal Government," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 62, 72 (1996).

Second, state authority within Indian country arises by virtue of the Tenth Amendment. As *Castro-Huerta* explains:

> [T]he Constitution allows a State to exercise jurisdiction in Indian country…. [A]s a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country. **See U.S. Const., Amdt. 10.** As this Court has phrased it, a State is generally "entitled to the sovereignty and jurisdiction over all the territory within her limits." *Lessee of Pollard v. Hagan*, 3 How. 212, 228, 11 L.Ed. 565 (1845).

597 U.S. at 636 (emphasis added).

The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. According to *Castro-Huerta*, since criminal authority over non-Indians in Indian country was neither delegated exclusively to the United States by the Constitution, nor prohibited by it to the states, a measure of that jurisdiction was reserved to the states by the Tenth Amendment, such that states enjoy "concurrent jurisdiction with the Federal Government to prosecute crimes committed by non-Indians against Indians in Indian country." 597 U.S. at 635.

That reasoning does not extend to state criminal jurisdiction over Indians in Indian country because the Tenth Amendment reserves to states only "that residuum of sovereignty not delegated to the United States by the Constitution," *Skiriotes v. Florida*, 313 U.S. 69, 77 (1941) (citation omitted). As *Pollard* (cited by *Castro-Huerta* in the block quotation above) confirms, a state's "jurisdiction over all the territory within her limits" is subject to "the rights surrendered

11

by the Constitution to the United States," 44 U.S. at 228, 229. Thus, where the Constitution

grants a power *exclusively* to Congress, no "residuum" of state authority remains because states

retain sovereignty under the Tenth Amendment "*only to the extent* that the Constitution has not

… transferred those powers to the Federal Government," *Garcia v. San Antonio Metro. Transit

Auth.*, 469 U.S. 528, 549 (1985) (emphasis added); *see also, e.g.*, *United States v. Comstock*, 560

U.S. 126, 144 (2010) ("Virtually by definition, these powers [delegated to Congress by the

Constitution] are not powers that the Constitution reserved to the States." (quotation marks

omitted)); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995) ("the Tenth Amendment

unambiguously confirms" that states retain no rights of sovereignty over matters that the

Constitution "*exclusively* delegated to the United States"); *Maricopa Cnty. v. Valley Nat'l Bank of

Phoenix*, 318 U.S. 357, 361 (1943) (where "Congress … has under the Constitution exclusive

authority" over a matter, it falls outside "the powers 'reserved to the States' under the Tenth

Amendment"); *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 612 (2022) (Thomas, J.,

dissenting, joined by Alito, J., Gorsuch, J., and Barrett, J.) ("Our precedents teach that whenever

a power is 'exercised exclusively by Congress, the subject is as completely taken from the State

Legislatures, *as if they had been expressly forbidden to act on it*.'" (quoting *Sturges v.

Crowninshield*, 17 U.S. (4 Wheat.) 122, 193 (1819))).[9]

In sum, because the Constitution vests criminal authority over Indians in Indian country

exclusively in the federal government, *see supra* pp. 10–11, the Tenth Amendment reserves no

residuum of that authority to the states. This is why *United States v. McBratney*, 104 U.S. 621

(1881), which *Castro-Huerta* identifies as "the leading case" supporting its decision, 597 U.S. at

637, holds that upon statehood a state assumes "criminal jurisdiction over its own citizens *and*

---

[9] The *Torres* majority did not dispute this principle; it focused on other issues to resolve the case.

*other white persons* throughout the whole of the territory within its limits," 104 U.S. at 624
(emphasis added). Oklahoma drew the same distinction in its merits briefing in *Castro-Huerta*. It
accepted that "[t]he policy of leaving *Indians* free from state jurisdiction and control is deeply
rooted in this Nation's history," Brief for the Petitioner at 36, *Castro-Huerta* (No. 21-429), 2022
WL 628282, at *36 ("*Castro-Huerta* Brief") (brackets in original) (emphasis added by
Oklahoma) (quoting *McGirt*, 591 U.S. at 928), while asserting that this principle "says nothing
about state power over non-Indians," *id.* The Tenth Circuit has likewise recognized that "the
federal government's plenary and exclusive constitutional authority to legislate in respect to
Indian tribes … leav[es] Indians free from state jurisdiction and control." *Ute Indian Tribe of the
Uintah and Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 899–900 (10th Cir. 2022) (quotation marks
omitted); *accord Cohen's* § 6.03[1][a], at 512 (the Constitution "vests exclusive authority over
Indian affairs in the federal government … vis-à-vis the states … unless Congress legislates to
the contrary").

    And while it is true that "Congress can authorize the States to exercise … powers that the
Constitution has otherwise placed off limits," *Lara*, 541 U.S. at 211 (Stevens, J., concurring), "it
must make its intention to do so unmistakably clear," *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286
(2002) (quotation marks omitted)). In *McGirt*, the Court concluded that Congress has not
expressly conferred criminal jurisdiction over Indians in Indian country on Oklahoma, such that
the State (and its political subdivisions) lack such jurisdiction. That holding remains binding
today.

### 3. Subjective Judicial Balancing Cannot Be Substituted for the Constitutional Design and Congress's Will.

    In *Castro-Huerta*, the Court applied the *Bracker* balancing test to determine the legality
of Oklahoma's assertion of criminal jurisdiction over a non-Indian defendant. *See* 597 U.S. at

649–51. But it did so only after concluding that, pursuant to the Tenth Amendment, Oklahoma enjoys jurisdiction over non-Indians in Indian country concurrent with that of the federal government. *Id*. at 636–48.

By contrast, the balancing test has no applicability where a state asserts criminal jurisdiction over an Indian in Indian country. *Bracker* itself recognizes that state law is "generally inapplicable" to such Indians and describes its balancing test as one that courts apply to resolve the "[m]ore difficult questions [that] arise where … a State asserts authority over the conduct of *non-Indians* … on the reservation." 448 U.S. at 144 (emphasis added). In *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95 (2005), the Supreme Court stated that *Bracker* balancing "applies only" in that context. *Id*. at 99. The Tenth Circuit thereafter (in a case involving on-reservation Indian conduct) held that the Supreme Court's ruling that *Bracker* balancing "applies only" to state jurisdiction over non-Indians "compels our departure from … *Bracker* interest balancing" because "[t]he conduct of non-Indians, whether on- or off-reservation, is not at issue here." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 823 (10th Cir. 2007).

The inapplicability of *Bracker* balancing to questions of state criminal jurisdiction over Indians in Indian country again follows not only from controlling precedent but also from bedrock constitutional principles. Because the Constitution vests criminal jurisdiction over Indians in Indian country exclusively in Congress, states lack that jurisdiction unless and until Congress confers it. *See supra* pp. 10–13. Thus, while "*Congress* can authorize the States" to exercise jurisdiction "that the Constitution has otherwise placed off limits," *Lara*, 541 U.S. at 211 (Stevens, J., concurring) (emphasis added), courts have no parallel authority to do so via application of a balancing test, as that would judicially usurp the very prerogative reserved exclusively to Congress by the Constitution. *See*, *e.g.*, *District of Columbia v. Heller*, 554 U.S.

14

570, 635 (2008) (a constitutional prescription "is the very *product* of an interest balancing by the people," which judges should not "conduct for them anew"); *Crawford v. Washington*, 541 U.S. 36, 67–68 (2004) (replacing constitutional requirements "with open-ended balancing … do[es] violence" to the constitutional design); *New Jersey v. Portash*, 440 U.S. 450, 459 (1979) (where constitutional prescription is clear, judicial "[b]alancing … is not simply unnecessary. It is impermissible"); *Luis v. United States*, 578 U.S. 5, 33 (2016) (Thomas, J., concurring) (constitutional prescription "leaves no room for [judicial] balancing…. The People, through ratification, have already weighed the policy tradeoffs").

Even in the interstate commerce context, where the Constitution has transferred authority to Congress less completely than it has over Indians—*see, e.g.*, *Seminole Tribe*, 517 U.S. at 62 ("the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause")—judicial balancing is a hazardous enterprise and "should therefore be left to Congress," *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 360 (2008) (Scalia, J., concurring in part). The considerations to be weighed

> are always incommensurate, and cannot be placed on the opposite balances of a scale without assigning a policy-based weight to each of them. It is a matter not of weighing apples against apples, but of deciding whether three apples are better than six tangerines…. Of course you cannot decide which interest "outweighs" the other without deciding which interest is more important to you.

*Id*. Better, Justice Scalia explained, to "leave these quintessentially legislative judgments with the branch to which the Constitution assigns them." *Id*.

This reasoning applies with particular force here, where Congress has already rendered the judgments assigned to it exclusively by the Constitution. Congress has, at various junctures beginning in 1940, statutorily authorized individual states to exercise jurisdiction over Indians in

Indian country.[10] And in 1953, it enacted legislation applicable to all states. *See* Act of Aug. 15, 1953, Pub. L. No. 83-280, 67 Stat. 588 ("P.L. 280").

Congress enacted those statutes because states generally "lack jurisdiction to prosecute Indians" in Indian country, *Bryan v. Itasca Cnty.*, 426 U.S. 373, 379–80 (1976) (quoting H.R. Rep. No. 83-848, at 5–6 (1953)), and the Supreme Court has likewise understood them to be "surrenders of authority" to states, *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 471 n.8 (1979). Notably, Congress surrendered that authority only after "comprehensive and detailed congressional scrutiny," *Kennerly v. Dist. Ct.*, 400 U.S. 423, 427 (1971), and "a wide-ranging … congressional study" of the relative tribal, state, and federal interests involved, *Three Affiliated Tribes of Fort Berthold Rsrv. v. Wold Eng'g*, 476 U.S. 877, 887 (1986), including Congress's assessment of the capacities of tribal and state sovereigns to exercise criminal jurisdiction over Indians, *see, e.g.*, *Bryan*, 426 U.S. at 385 (Congress "completely exempted" several reservations from P.L. 280 based on its finding that "each had a 'tribal law-and-order organization that functions in a reasonably satisfactory manner'" (quoting H.R. Rep. No. 83-848, at 7)).

What is more, "[a]s originally enacted, Pub.L. 280 did not require States to obtain the consent of affected Indian tribes before assuming jurisdiction over them[.]" *Wold Eng'g*, 467 U.S. at 879. But Congress amended the statute in 1968 to forbid states from doing so going forward absent "the consent of the [Indian] tribe[.]" Act of Apr. 11, 1968, Pub. L. No. 90-284, tit. IV, §§ 401(a), 402(a), 82 Stat. 73, 78, 79. *See Wold Eng'g*, 467 U.S. at 879 (Congress "require[d] that all subsequent assertions of jurisdiction be preceded by tribal consent"). It further provided

---

[10] *See* 18 U.S.C. § 3243 (Kansas); Act of July 2, 1948, ch. 809, 62 Stat. 1224 (New York); Act of June 30, 1948, ch. 759, 62 Stat. 1161 (Iowa); Act of May 31, 1948, ch. 279, 60 Stat. 229 (North Dakota); Act of Oct. 5, 1949, ch. 604, 63 Stat. 705 (California).

that states may, under certain limited circumstances, relinquish jurisdiction previously assumed under P.L.280 to the United States. Pub. L. No. 90-284, tit. IV, § 403, 82 Stat. at 79. In enacting these amendments, "Congress was motivated by a desire to shield the Indians from unwanted extensions of jurisdiction over them" in light of its concern for "tribal sovereignty and self-government[.]" *Wold Eng'g*, 476 U.S. at 887.

Thus, with respect to state criminal jurisdiction over Indians in Indian country, Congress has already rendered the "quintessentially legislative judgments" that Justice Scalia properly admonished the courts to avoid in deference to "the branch to which the Constitution assigns them," *Davis*, 553 U.S. at 360 (Scalia, J., concurring in part). The Supreme Court—in light of the separation of powers principles so obviously implicated—has accordingly "enforced the procedural … and … jurisdictional provisions of Pub.L. 280 quite stringently, consistent with [its] understanding that the jurisdictional scheme embodied in that Act was the product of a wide-ranging and detailed congressional study," *Wold Eng'g*, 476 U.S. at 887.

It is inconceivable that these carefully considered legislative judgments—enshrined in statute and stringently enforced by the Supreme Court—as to how and when states may lawfully assume criminal jurisdiction over Indians in Indian country can be bypassed by unelected judges rendering subjective policy judgments in the context of case-by-case interest balancing. As the Supreme Court has admonished, courts should not "replace Congress's considered judgment" with their own because "[j]udicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law[.]" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 803 (2014) (citation omitted).

To be sure, P.L. 280 granted states criminal jurisdiction over both Indians and non-Indians in Indian country; and *Castro-Huerta* acknowledges that its holding therefore means that P.L. 280's grant of state jurisdiction over non-Indians was likely redundant of pre-existing law

17

and hence surplusage. 597 U.S. at 648. But *Castro-Huerta* also explicitly rejected the notion that

P.L. 280's grant of jurisdiction over *Indians* was likewise redundant of existing law:

> Public Law 280 encompasses far more than just non-Indian on Indian crimes (the
> issue here). Public Law 280 also grants States jurisdiction over crimes committed
> *by Indians*…. So our resolution of the narrow jurisdictional issue in this case does
> not negate the significance of Public Law 280 in affording States broad criminal
> jurisdiction over other crimes committed in Indian country, such as crimes
> committed by Indians.

*Id*.

To hold that P.L. 280 is redundant of existing law with respect to jurisdiction not only

over non-Indians but also over Indians would be to negate the very "significance of Public Law

280" that *Castro-Huerta* expressly confirms. Indeed, it would strip P.L. 280 (and the numerous

state-specific statutes that preceded it) of *all* import and meaning insofar as criminal jurisdiction

is concerned, rendering those provisions surplusage in their entirety. This is not a tenable

reading. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (rejecting

interpretation of jurisdictional statute that "would render much of [the statute] unnecessary" and

deprive it "of any import"); *McClanahan*, 411 U.S. at 178 (discussing P.L. 280 and stating that

"we cannot believe that Congress would have required the consent of the Indians … if the States

were free to accomplish the same goal unilaterally"). It is particularly untenable given that

addressing criminal jurisdiction over Indians was Congress's "primary concern" in enacting P.L.

280. *Bryan*, 426 U.S. at 379–80 (discussing H.R. Rep. No. 83-848, at 5–6).[11]

And to be crystal clear, the issue with Henryetta's position extends far beyond surplusage.

The claim that the courts may engage in a balancing of interests where Congress, acting in a

---

[11] The same is true for P.L. 280's state-specific predecessor statutes, as Oklahoma informed the
Court in *Castro-Huerta*. *See Castro-Huerta* Brief at 30, 2022 WL 628282, at *30 ("Congress was
primarily focused on the lack of jurisdiction over crimes committed *by Indians* in Indian
country.").

sphere to which the Constitution reserves it exclusive authority, has already done so runs headlong into the clear proscriptions against the judicial usurpation of legislative power. Congress has provided a process for Oklahoma and its political subdivisions to acquire criminal jurisdiction over Indians on the Creek Reservation, one that requires the Creek Nation's consent. Oklahoma has not pursued that process, and the Creek Nation has not consented. Henryetta's prosecution of Indians is nothing less than an attempted end-run around the Constitution and Congress's will. This Court should decline to bless that effort.

*    *    *

In sum, the Nation has a strong likelihood of success on the merits. The rule upheld in *McGirt* and *Ute Indian Tribe* controls this case, leaving this Court no room to encroach on Congress's exclusive authority by way of judicial interest balancing.

### B.    The Nation Will Suffer Irreparable Harm Absent Injunctive Relief.

The Nation has enacted its own criminal code, including a traffic code. It maintains tribal courts and a Lighthorse Police Department to enforce them against Creek citizens and other Indians within its boundaries. MCN Const. art. VII (Judicial Branch);[12] MCN Code tit. 14 (Crimes and Punishments), tit. 16 (Executive Branch), and tit. 27 (Judicial Procedures).[13] The City's ongoing efforts to prosecute Creek Citizens and other Indians for traffic offenses within the Creek Reservation undermine the Nation's ability to discharge these core sovereign functions.

The Tenth Circuit has "repeatedly stated that … an invasion of tribal sovereignty can constitute irreparable injury." *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir.

---

[12] http://bit.ly/4IjqCto.
[13] http://bit.ly/44LoW5X.

19

2006). Henryetta is prosecuting Creek citizens for offenses including operating a motor vehicle without a valid driver's license or in violation of vehicle registration and license plate requirements. *See* Decl. of Daniel L. Bear ¶¶ 2–4; Decl. of Darious Tiger ¶¶ 2–3; Decl. of Heather Rodgers ¶¶ 1–4. These are precisely the types of prosecutions that the Tenth Circuit has found to constitute irreparable harm to tribal sovereignty when a state or its subdivision initiates them against an Indian within a tribe's Indian country.

In *Ute Indian Tribe*, for example, Utah and a political subdivision were prosecuting an Indian for state law offenses including "operating a vehicle without license plates or registration" and "driving with a suspended or revoked license[.]" State of Utah's Answer Brief at 10, *Ute Indian Tribe* (No. 14-4034), 2014 WL 4180069, at *10. The Tenth Circuit held that the prosecution was "itself an infringement on tribal sovereignty," 790 F.3d at 1005, one compounded by the defendants' "disregard of this court's decisions," *id.*, foreclosing the very jurisdiction the state and its subdivision were asserting. Under these circumstances, "the harm to tribal sovereignty in this case [was] perhaps as serious as any to come our way in a long time." *Id*. at 1005.

The same is true here. Henryetta continues to prosecute Creek citizens and other Indians for traffic offenses (closely paralleling those at issue in *Ute Indian Tribe*) within the Creek Reservation despite the fact that the rule against such prosecutions has been "long since settled." *Id*. at 1006. Just as in *Ute Indian Tribe*, the City's repeated prosecutions of Indian defendants constitute "an infringement on tribal sovereignty" that stands in "disregard of [the Circuit's] decisions," *id*. Under these circumstances, "there's just no room to debate whether the defendants' conduct 'create[s] the prospect of significant interference with [tribal] self-government' that this court has found sufficient to constitute 'irreparable injury.'" *Id.* (brackets in

original) (quoting *Prairie Band*, 253 F.3d at 1250–51); *see also Wyandotte Nation*, 443 F.3d at

1251–52, 1255.

In *Prairie Band*, the Tenth Circuit likewise found Kansas's enforcement of its vehicle

registration requirements against Indians to constitute irreparable injury to tribal sovereignty in

part because, as is the case here, the tribe had promulgated its own laws governing such

matters—which the Court described as "a traditional governmental function"—and thus "the

threat of continued citation by the state" of Indian motorists "created the prospect of significant

interference with [tribal] self-government." 253 F.3d at 1250 (brackets in original) (quotation

marks omitted). Under these circumstances, "the injury to the tribe was 'certain and great' and

more than 'merely serious or substantial.'" *Id*.; *see also, e.g.*, *Fisher v. Dist. Ct.*, 424 U.S. 382,

387–88 (1976) ("State-court jurisdiction plainly would interfere with the powers of self-

government" by subjecting Indians in Indian country "to a forum other than the one they have

established for themselves.").

There is no meaningful factual or legal daylight between Henryetta's actions here and the

governmental actions that the Tenth Circuit found to constitute irreparable harm to tribal

sovereignty in *Ute Indian Tribe* and *Prairie Band*. Those precedents compel the conclusion that

the City is inflicting irreparable injury on the Nation. And the City has refused every entreaty to

stop. Wisner Decl. ¶¶ 18–22.

If anything, the harm to tribal sovereignty here is greater than the harms at issue in *Ute

Indian Tribe and Prairie Band*. The Nation has structured its criminal laws and enforcement

mechanisms so that they "best ensure public safety while honoring victims' needs and

maximizing the prospects that offenders will respect the law going forward and avoid further

harm to the community." *Id.* ¶ 28. Among the expectations accordingly embedded in the Nation's

criminal justice system is that those responsible for enforcing the Nation's laws will do so with

21

"paramount regard for the individual dignity and practical well-being of all members of the community, including criminal defendants[.]" *Id*. Central to the bonds of trust that must exist between the Nation and its Indian constituents is the Nation's solemn commitment to those under its jurisdiction that measures such as vehicle impoundment and incarceration, while "among the most vital and indispensable of law enforcement tools," *id.* ¶ 27, will be wielded with appropriate respect for their potential to "impact individual lives and families," *id.* ¶ 28, and as such should not be a routine result of a traffic stop or other law enforcement encounter, *id*. ¶¶ 26-28.

The declarations submitted by the Nation make clear that the treatment to which the Nation's citizens are being subjected at the hands of Henryetta's officials is making it impossible for the Nation to keep that solemn commitment. Nation citizens are being arrested and incarcerated and having their vehicles impounded under circumstances that reflect, in the Nation's view, woefully insufficient regard for the disruption such measures can cause. Henryetta's actions are wholly disproportionate to the infractions for which Creek citizens are being punished, and wholly unwarranted by public safety imperatives. *See* Bear Decl. ¶¶ 5–6; Tiger Decl. ¶¶ 2–5; Rodgers Decl. ¶¶ 2–6; Decl. of Brandy Hill ¶¶ 3–7.

*Ute Indian Tribe* and *Prairie Band* did not turn on any such treatment of Indian defendants. The bare fact of the state-law prosecution of Indians for Indian country offenses was, as here, something that states and their subdivisions "have no legal entitlement to do in the first place," *Ute Indian Tribe*, 790 F.3d at 1007, and therefore was "itself an infringement on tribal sovereignty," *id.* at 1005, that was "sufficient to constitute 'irreparable injury,'" *id*. at 1006 (quoting *Prairie Band*, 253 F.3d at 1250–51), such that "the district court should have issued a preliminary injunction and must do so now," *id*. at 1005. Indeed, in *Prairie Band*, there were no ongoing prosecutions at all. They had been dismissed or otherwise resolved, 253 F.3d at 1238, and the Court nevertheless found irreparable harm sufficient to warrant a preliminary injunction

22

based simply on the fact of past citations and "[t]he possibility of future prosecutions," *id*. at

1242. If injunctive relief had to issue in those cases, it surely does here.

C.    **The Balance of Harms and the Public Interest Favor Injunctive Relief.**

Where a case involves competing claims of jurisdiction, the Tenth Circuit has analyzed

the balance of harms and public interest factors together. *See Ute Indian Tribe*, 790 F.3d at 1007.

In assessing the virtually identical circumstances in *Ute Indian Tribe*, the Circuit declared that

> there's no question who has the better of it. On the Tribe's side of the ledger [is]
> … the "paramount federal policy" of ensuring that Indians do not suffer
> interference with their efforts to "develop ... strong self-government." *Seneca-*
> *Cayuga Tribe v. Oklahoma ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir.1989);
> *see also Prairie Band*, 253 F.3d at 1253. Against this, the State and Wasatch
> County argue an injunction would impede their ability to ensure safety on public
> rights-of-way. But this concern "is not as portentous as [they] would have it."
> *Prairie Band*, 253 F.3d at 1253…. [N]othing in the requested temporary
> injunction would prevent the State and County from patrolling roads like the ones
> on which Ms. Jenkins was stopped, from stopping motorists suspected of traffic
> offenses to verify their tribal membership status, from ticketing and prosecuting
> non-Indians for offenses committed on those roads, from referring suspected
> offenses by Indians to tribal law enforcement, or from adjudicating disputes over
> the Indian status of accused traffic offenders when meaningful reasons exist to
> question that status. Instead, the temporary injunction would simply prohibit the
> State and County from prosecuting Ms. Jenkins and perhaps other tribal members
> for offenses in Indian country—something they have no legal entitlement to do in
> the first place. In this light, the defendants' claims to injury should an injunction
> issue shrink to all but "the vanishing point." *Seneca-Cayuga*, 874 F.2d at 716.

*Id*. (second ellipsis and second brackets in original).

The same reasoning applies with even greater force here. As described above, the City's

actions interfere with the Nation's exercise of its own governmental authority over its citizens.

And any law enforcement concerns the City may invoke will not be as portentous as it may

assert. The Nation and the vast majority of the prosecuting jurisdictions within its Reservation

have in place cross-deputization agreements that memorialize the very practices the Tenth Circuit

concluded would allay such public safety concerns. *See supra* pp. 3–4; Wisner Decl. ¶¶ 13–16.

23

Under those agreements, all tribal and non-tribal officers possess arrest authority within the Creek Reservation over all persons within their respective jurisdictions, Indian and non-Indian alike, and for tribal, state, and municipal offenses, including traffic offenses. *Id.* ¶¶ 13, 16, 17, 22. If an arrest or stop is made by a cross-deputized officer of a jurisdiction without prosecutorial authority, the case is then referred to the jurisdiction possessing that authority. *Id.* ¶¶ 16, 22. Other jurisdictions within the Creek Reservation regularly refer matters involving Indians to the Nation, *id.* ¶¶ 12–14, and the Nation's Lighthorse Police collaborates in a highly productive manner with law enforcement authorities in those jurisdictions to maximize public safety for all, *id.* ¶ 12. Indeed, after several years of dispute, the Nation and the City of Tulsa have recently consummated an agreement over the allocation of criminal jurisdiction, with Tulsa agreeing to refrain from prosecuting Indians within the Nation's Reservation and instead to refer all such cases to the Nation to prosecute. *See* Wisner Decl. ¶¶ 24-25 and Exhibit B. ¶¶ 8-13. The Agreement additionally creates a cross-jurisdictional working group to assess and evaluate potential new policies and practices to help the parties "achieve their joint public safety and law enforcement priorities." Wisner Decl. ¶¶ 24-25 and Exhibit B. ¶ 14.[14]

---

[14] *See also, e.g.*, City-Manager-Report-March-2025-PDF at 14 (post-*McGirt* partnership between City of Coweta and Nation "has set an example for law enforcement agencies across northeastern Oklahoma. Lighthorse Police and Coweta officers are cross-deputized, meaning both agencies can make arrests regardless of a suspect's tribal status. The collaboration ensures law enforcement is on the same page and working toward the shared goal of public safety"); Muscogee Nation and Coweta Police celebrate beneficial partnership | News | fox23.com (Coweta Police Chief stating that "[t]he cooperation between our two agencies … [is] very strong"); Okmulgee Police, Muscogee Lighthorse Sign Cross-Commission Agreement (video of City of Okmulgee police chief discussing post-*McGirt* cross-deputization agreement with Lighthorse Police as a "force multiplier"); *see also, e.g.*, Okla. Atty. Gen. Cert. of Appreciation; U.S. Atty's Office E.D. Okla. Press Release; Wagoner County Sheriff's Office Statement; District 22 Drug and Violent Crimes Task Force Statement; U.S. Atty's Office N.D. Okla. Statement.

By contrast, the City has thus far rejected the Nation's repeated pleas to enter into a cross-deputization agreement. *Id.* ¶ 18. In fact, the City's Police Chief has directed the City's law enforcement officers not to cooperate with or involve Lighthorse officers in any way in criminal law enforcement but instead to go things alone. *Id*. ¶¶ 20–23. This intransigence is without warrant and runs completely counter to the furtherance of public safety. *Cf. McGirt*, 591 U.S. at 937 (extolling the success of the "hundreds of intergovernmental agreements with tribes, including many with the Creek" in Oklahoma, and "the spirit of good faith, comity and cooperative sovereignty behind these agreements" (quotation marks omitted)). In light of all this, and because the City's prosecutions of Creek citizens within the Creek Reservation are something it has "no legal entitlement to do in the first place," *Ute Indian Tribe*, 790 F.3d at 1007, the City's interests here likewise "shrink to all but the vanishing point," *id*. (quotation marks omitted).

On the Nation's side of the ledger, as discussed above, Henryetta's insistence on carrying out unlawful prosecutions of Indians during the pendency of this litigation is undermining the Nation's ability to govern on the Reservation. And the harm from the City's conduct reaches beyond the Nation to the public at large. The Tenth Circuit has emphasized that tribal sovereignty and self-government are matters of paramount public importance. *Prairie Band of Potawatomi Nation v. Wagnon*, 476 F.3d at 824 n.9 (collecting authorities). Henryetta's actions run directly counter to those public interests, and an injunction is necessary to put those actions to an end.

## CONCLUSION

The Nation respectfully requests that the Court preliminarily enjoin the City from any further assertion of criminal jurisdiction over Indians within the Creek Reservation.

Dated: July 9, 2025                        Respectfully submitted,


                                           */s/ Riyaz A. Kanji*
Geraldine Wisner, OBA No. 20128            Riyaz A. Kanji
Deputy Attorney General                    David A. Giampetroni
MUSCOGEE (CREEK) NATION                     KANJI & KATZEN, P.L.L.C.
P.O. Box 580                               P.O. Box 3971
Okmulgee, OK 74447                         Ann Arbor, MI 48106
(918) 295-9720                             (734) 769-5400
gwisner@mcnag.com                          rkanji@kanjikatzen.com
                                           dgiampetroni@kanjikatzen.com

O. Joseph Williams, OBA No. 19256
O. JOSEPH WILLIAMS LAW OFFICE, PLLC         Philip H. Tinker, OBA No. 36498
The McCulloch Building                     Stephanie R. Rush, OBA No. 34017
114 N. Grand Avenue, Suite 520             KANJI & KATZEN, P.L.L.C.
P.O. Box 1131                              12 N. Cheyenne Avenue, Suite 220
Okmulgee, OK 74447                         Tulsa, OK 74103
(918) 752-0020                             (206) 344-8100
jwilliams@williamslaw-pllc.com             ptinker@kanjikatzen.com
                                           vrush@kanjikatzen.com


            *Counsel for Muscogee (Creek) Nation*

**CERTIFICATE OF SERVICE**

I certify that on July 9, 2025, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.


*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
