IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MUSCOGEE (CREEK) NATION,<br>a federally recognized Indian tribe,<br><br>*Plaintiff*,<br><br>v.<br><br>CITY OF HENRYETTA, OKLAHOMA, and<br>JOHN INSABELLA, in his official capacity<br>as City Attorney for the City of Henryetta.<br><br>*Defendants*. | Case No. 25-CV-00227-JAR |

**MUSCOGEE (CREEK) NATION'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

The City of Henryetta posits an array of arguments in opposition to the Nation's motion for a preliminary injunction. All of them lack merit.

I.     **The Nation Does Not Seek a Disfavored Injunction.**

Henryetta contends that the Nation's requested injunction is disfavored and subject to a heightened standard because it (1) alters the status quo; (2) is mandatory; and (3) provides all the relief the Nation could recover through a trial on the merits. Henryetta Br. 9–10. None of these disfavored categories describes the Nation's requested injunction, and it would amply satisfy any applicable standard in any event.

<u>First</u>, "[a]n injunction disrupts the status quo when it changes the last peaceable uncontested status existing between the parties *before the dispute developed*." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070–71 (10th Cir. 2009) (emphasis added) (quotation marks omitted). Here, the last uncontested status followed *McGirt v. Oklahoma*, 591 U.S. 894 (2020), which foreclosed state criminal jurisdiction over Indians within the Creek Reservation, *id.* at 929. Oklahoma recognized *McGirt* to embody this principle,[1] and no record exists in this case that Henryetta disputed that holding or declined to comply with it. The dispute arose later when Henryetta began prosecuting Indians under the purported authority of *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022), and *City of Tulsa v. O'Brien*, Case Number: S-2023-715, 2024 WL 5001684 (Okla. Crim. App. Dec. 5, 2024). Far from disrupting a peaceable status quo, then, the Nation's motion seeks a return to the circumstances existing prior to the disruption caused by Henryetta's current, contested position.

---

[1] Brief for the Petitioner at 36, *Oklahoma v. Castro-Huerta* (No. 21-429), 2022 WL 628282, at *36 (recognizing that "'[t]he policy of leaving *Indians* free from state jurisdiction and control is deeply rooted in this Nation's history,' *McGirt* v. *Oklahoma*," while stating that this "says nothing about state power over non-Indians" (brackets in original)).

1

Second, the requested injunction is prohibitory, not mandatory. It would simply enjoin Henryetta's prosecutions, which should hardly require the "ongoing supervision" of the Court, Henryetta Br. 9.

Third, for an injunction to satisfy the final category, the Tenth Circuit "require[s] that the effect of the order, once complied with, cannot be undone," such as "a case involving the disclosure of confidential information[.]" *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247–48 (10th Cir. 2001) (citations omitted). The City nowhere mentions this requirement, and it is not met. It will be able to resume its prosecutions if it prevails at trial.

## II.     Henryetta Has Not Undermined the Nation's Likelihood of Success on the Merits.

### A.     The Rule Reaffirmed in *McGirt* Is Not Limited to the Major Crimes Act.

Henryetta contends that *McGirt* is limited to the Major Crimes Act, 18 U.S.C. § 1153 (MCA), because the decision states that "Congress allowed only the federal government, not the States, to try tribal members for *major crimes*." Henryetta Br. 11 (quoting *McGirt*, 591 U.S. at 934) (emphasis by Henryetta). But the quoted statement is "simply a customary nod to the truism that we decide only the case before us," *Shinn v. Ramirez*, 596 U.S. 366, 387 (2022) (citation omitted). There is no gainsaying that in deciding the case before it, the Court reaffirmed and applied a core principle of federal Indian law: "State courts generally have no jurisdiction to try Indians for conduct committed in Indian country," *McGirt*, 591 U.S. at 898 (quotation marks omitted), absent "a clear expression of the intention of Congress," *id.* at 929 (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572 (1883)).

The Court's reliance on *Crow Dog* underscores the point. *Crow Dog* predated the enactment of the MCA and involved the predecessor statute to the General Crimes Act, 18 U.S.C. § 1152, which Henryetta acknowledges its prosecutions to be "governed by," Henryetta Br. 11. Yet *Crow Dog* still relied on the general rule, which it described as reflecting the "policy

2

of the government towards the Indians, as declared in many statutes and treaties, and recognized in many decisions of this court, from the beginning to the present time," 109 U.S. at 572.

*Hagen v. Utah*, 510 U.S. 399 (1994), likewise recognizes the controlling force of the rule in the context of a non-MCA offense. *See id*. at 401–02, 408 ("Congress has not granted criminal jurisdiction to … Utah to try crimes committed by Indians in Indian country," and therefore only if land "is not in Indian country" did Utah "properly exercise[] criminal jurisdiction over petitioner, an Indian" (citation omitted)). And *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000 (10th Cir. 2105), also involved a non-MCA offense, yet the Court again adhered to the rule that "states possess no authority to prosecute Indians for offenses in Indian country" absent congressional assent, *id.* at 1004 (quotation marks omitted).

      **B.**    *Castro-Huerta* **Did Not Overturn the Rule Reaffirmed in** *McGirt.*

Remarkably, Henryetta asserts that *McGirt*, decided just five Terms ago, "is old and … inapplicable" and that *Castro-Huerta* supplanted it as the controlling precedent for cases involving state criminal jurisdiction over Indians. Henryetta Br. 2. But as the Nation addressed in its opening brief, *Castro-Huerta* repeatedly and explicitly disclaims any intent to reach such cases. It refers to state jurisdiction over non-Indians in Indian country as "the narrow jurisdictional issue in this case," 597 U.S. at 648, and to state criminal jurisdiction over Indians as "a question not before us," *id*. at 639 n.2. And as to the latter, *Castro-Huerta* is emphatic: "We express no view on state jurisdiction over a criminal case of that kind," *id.* at 650 n.6. "To reiterate, we do not take a position on that question." *Id.* at 655 n.9.

Henryetta ignores the disclaimers, but courts may not. Just a month before it issued *Castro-Huerta*, the Supreme Court explained (in a decision joined by each member of the *Castro-Huerta* majority) that when one of its decisions includes "unusually explicit" and "aggressively limiting language," that "foreclose[s] any extension of its holding beyond the

3

narrow [question] at issue in that case," *Shinn*, 596 U.S. at 387 (quotation marks and citations omitted). *Castro-Huerta*'s repeated disclaimers epitomize such explicit, aggressively limiting language.

Nor does Henryetta acknowledge the mountain of controlling precedent cited by the Nation holding that lower courts are prohibited from disregarding a prior Supreme Court or Tenth Circuit decision on the basis that a subsequent Supreme Court decision overruled the prior case by implication. While Henryetta might like to wish away that precedent, it controls here.[2]

Henryetta also has no answer for the significance of *Castro-Huerta*'s reliance on the Tenth Amendment, 597 U.S. at 636. As the Nation addressed in its opening brief, *see* P.I. Mot. 10–13, unlike state jurisdiction over non-Indians, the Constitution grants criminal authority over Indians in Indian country *exclusively* to the federal government. *See Haaland v. Brackeen*, 599 U.S. 255, 272 (2023). And "the Tenth Amendment unambiguously confirms" that states retain no authority over matters the Constitution "*exclusively* delegated to the United States." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995) (citation omitted). Henryetta's sole response that "this flies in the face of … *Castro-Huerta*," Henryetta Br. 14, is conclusory and entirely sidesteps the Nation's well-supported argument.

Henryetta further urges that the Nation's arguments regarding state jurisdiction over Indians were rejected by the majority in *Castro-Huerta*. *Id.* at 12–13. Henryetta does not explain how that can be when *Castro-Huerta* expressly declines to reach the issue. *See supra* p. 3. In the

---

[2] *See* P.I. Mot. 9–10 (discussing, *e.g.*, *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023); *Bosse v. Oklahoma*, 580 U.S. 1 (2016); *Agostini v. Felton*, 521 U.S. 203 (1997); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533 (1983); *Fed. Trade Comm'n v. Elite IT Partners, Inc.*, 91 F.4th 1042 (10th Cir. 2024); *United States v. Maloid*, 71 F.4th 795 (10th Cir. 2023); *Strain v. Regalado*, 977 F.3d 984 (10th Cir. 2020)).

4

passage cited by Henryetta, the Court simply rejected the dissent's argument to the extent it swept in "even jurisdiction to prosecute crimes committed by non-Indians." 597 U.S. at 652.

Equally invalid is Henryetta's reliance on "the Statement of Justice Kavanaugh" on Tulsa's application for a stay of *Hooper v. City of Tulsa*, 71 F.4th 1270 (10th Cir. 2023), Henryetta Br. 18. Henryetta is unclear as to what lesson this Court should take from that statement, but what is clear is that *seven* members of the Court declined to subscribe to it.[3]

### C. *Bracker* Balancing Cannot Be Applied in This Case.

In its opening brief, the Nation set forth extensive Supreme Court and Tenth Circuit precedents and federal statutes making clear that the question of state criminal jurisdiction over Indians in Indian country is reserved to Congress and that condoning such jurisdiction through judicial balancing would usurp Congress's role. P.I. Mot. 13–19. *Castro-Huerta* is not to the contrary: "We express no view on state jurisdiction over a criminal case of that kind." 597 U.S. at 650 n.6. Henryetta responds to none of the Nation's authorities on this point.

### D. Neither *Duro* Nor *Colville* Supports Henryetta's Claimed Jurisdiction.

Henryetta contends that *Duro v. Reina*, 495 U.S. 676 (1990), and *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980), support its jurisdiction over non-member Indians. Henryetta Br. 4, 16–17. Not so. *McGirt* involved a non-member Indian, *see* 591 U.S. at 898, yet squarely applied the presumptive rule against State jurisdiction absent congressional assent.[4] *Hagen* (which also post-dated *Duro* and *Colville*) likewise involved

---

[3] Henryetta also claims jurisdiction under the Curtis Act, 30 Stat. 495 (1898). It contends that *Hooper* turned on Tulsa's adoption of a new charter after statehood. Henryetta Br. 18 n.4. *But see* 71 F.4th at 1286–87 ("[U]pon statehood, *even prior to Tulsa's adoption of a new charter* under Oklahoma law, Tulsa ceased to be a municipality organized [under the Curtis Act].... So ... the Curtis Act no longer applied to Tulsa upon statehood[.]" (emphasis added)).

[4] *McGirt*'s dissenters (each of whom joined the *Castro-Huerta* majority) did not dispute the applicability of this rule to the non-member Indian defendant. *See* 591 U.S. at 938–73 (Roberts,

a non-member Indian, *see* Petitioner's Brief, *Hagen* (No. 92-6281), 1993 WL 384821, at *4 (describing defendant as a member of the Little Shell Band in a case arising on land alleged to be part of the Uintah Reservation in Utah), and again recognized the applicability of the presumptive rule against state criminal jurisdiction over an Indian in Indian country. *Supra* p. 3.

*Duro* is not to the contrary. It held that "tribal jurisdiction extends to tribe members only," 495 U.S. at 691, and recognized that a jurisdictional void would result due to the corresponding lack of state criminal jurisdiction over Indians, member or non-member. As the dissent put it:

> [T]he Court today creates a jurisdictional void …. States do not have power to exercise criminal jurisdiction over crimes involving Indians on the reservation … [and thus] lack jurisdiction to prosecute the [non-member Indian] crime involved in this case.

*Id.* at 704–05 & n.3 (Brennan, J., dissenting). The majority accepted that such a void would result but rejected that as a "policy … basis for finding tribal jurisdiction" over non-member Indians, *id*. at 698, because "Congress has provided a mechanism by which the States now without jurisdiction in Indian country may assume criminal jurisdiction through Pub.L. 280," *id*. at 697. If that proved insufficient, "the proper body to address the problem is Congress[.]" *Id.* at 698. Congress then did so, reaffirming tribal criminal jurisdiction over non-member Indians, *see* 25 U.S.C. § 1301(1) ("*Duro* fix"), precisely to fill the jurisdictional void:

> *[T]he states do not have jurisdiction to try Indians for criminal offenses committed within Indian reservations except in those few instances in which Congress has conferred such authority upon them*. Thus, *Duro*'s holding that tribes lack criminal jurisdiction over *non-member Indians* has created a void in the preservation of law and order on many reservations.

---

C.J., dissenting). They simply disagreed with the majority as to whether Congress had, in fact, provided the requisite statutory assent. *See id*. at 951 (discussing the "series of statutes" by which Congress allegedly conferred the disputed criminal jurisdiction on Oklahoma).

H.R. Rep. No. 102-61, at 3–4 (1991) (emphases added); *see also* H.R. Conf. Rep. No. 102-261, at 5 (1991) (absent assent of Congress, "a state cannot exercise jurisdiction over crimes … by non-tribal member Indians"); H.R. Conf. Rep. No. 101-938, at 104 (1990) ("[U]nless the Congress acts to fill this jurisdictional void, [non-member Indians] … may come onto an Indian reservation … and know that there is *no governmental entity that has the jurisdiction to prosecute them* for their criminal acts." (emphasis added)). *Duro* and its subsequent history, then, amply confirm both the Court's and Congress's understanding of the general rule.[5]

Henryetta's reliance on *Colville* is equally infirm. *Colville* simply "held that [non-member Indians] … 'stand on the same footing as non-Indians' … *insofar as imposition of tax on cigarette sales is concerned*." *Rice v. Rehner*, 463 U.S. 713, 720 n.7 (1983) (emphasis added). It so held based on non-member Indians' purported lack of beneficial participation in tribal affairs. *See* 447 U.S. at 161. *Duro* extended this reasoning to the criminal context. It quotes *Colville*'s "same footing" passage, 495 U.S. at 687; echoes *Colville*'s views on non-member Indians' lack of participation in tribal affairs, *id*. at 688, 693; and concludes that therefore, "[f]or purposes of criminal jurisdiction, petitioner's relations with this Tribe are the same as the non-Indian's," *id*. at 688. In enacting the *Duro* fix, Congress noted *Duro*'s reasoning—*see* H.R. Rep. No. 102-61, at 3 ("[T]he Supreme Court viewed his relationship with the tribe as the functional equivalent of a non-Indian.")—and repudiated its extension to the criminal context:

---

[5] *See Sunnyside Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 112 F.4th 902, 912–13 (10th Cir. 2024) ("Congress's purpose in passing the law is verified by a Senate [Committee] Report … [that] indicates the Senate's awareness of" what the law sought to address); *People for Ethical Treatment of Prop. Owners v. U.S. Fish and Wildlife Serv.*, 852 F.3d 990, 1006 (10th Cir. 2017) (looking to House and Senate Reports to determine what "the statutory scheme was intended" to address). Dissenting on other grounds in *United States v. Lara*, 541 U.S. 193 (2004), Justices Souter and Scalia (who joined the *Duro* majority) agreed that "the principal object" of the *Duro* fix "was to close the jurisdictional void created by *Duro*[.]" *Id.* at 231 (Souter, J., and Scalia, J., dissenting) (quotation marks omitted).

> Congress has recognized that tribal governments afford a broad array of rights and privileges to non-tribal members. Non-tribal member Indians own property on Indian reservations, their children attend tribal schools, their families receive health care from tribal hospitals and clinics. Federally-administered programs and services are provided to Indian people because of their status as Indians, without regard to whether their tribal membership is the same as their reservation residence. The issue of who is an Indian for purposes of Federal law is well-settled as a function of two hundred years of Constitutional and case law and Federal statutes.

H.R. Conf. Rep. No. 101-938, at 104. Henryetta has given this Court no basis to second-guess Congress's conclusion. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 803 (2014) ("Judicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law." (citation omitted)).

### III.   Henryetta Has Not Undermined the Nation's Claim of Irreparable Harm.

In its opening brief and declarations, the Nation set forth the factual basis for its claim of irreparable harm. *See* P.I. Mot. 19–23. It further drew a throughline between this case and the directly analogous facts in *Ute Indian Tribe* and *Prairie Band*, facts that the Tenth Circuit has found to constitute irreparable harm. *Id*. Henryetta does not address the Nation's arguments, except to assert that "[w]hile *Ute* has yet to be expressly overturned, *Castro-Huerta* and the intimations of Justice Kavanaugh has it teetering precariously on that ledge." Henryetta Br. 21. But as the Nation has already established, *Ute Indian Tribe* remains on solid ground, and even if it were teetering on a ledge, it would not be this Court's role to push it over. *See* P.I. Mot. 9–10 (citing *Fed. Trade Comm'n v. Elite IT Partners, Inc.*, 91 F.4th 1042, 1051 (10th Cir. 2024)).

### IV.   The Balance of Equities and the Public Interest Favor an Injunction.

*Ute Indian Tribe* squarely addresses the balance of equities and public interest prongs of the preliminary injunction test in the context of a county engaged in exactly the same behavior as Henryetta is here—prosecuting Indians for non-major offenses within Indian country—and

8

based on public safety arguments identical to Henryetta's.[6] But those arguments fell flat because

> nothing in the requested temporary injunction would prevent the State and County from patrolling roads …, from stopping motorists suspected of traffic offenses to verify their tribal membership status, from ticketing and prosecuting non-Indians for offenses committed on those roads, from referring suspected offenses by Indians to tribal law enforcement, or from adjudicating disputes over the Indian status of accused traffic offenders[.]

791 F.3d at 1007. Because the county declined to undertake these available measures, its claims to injury from an injunction "shr[a]nk to all but the vanishing point." *Id*. (quotation marks omitted). Thus, "the district court should have issued a preliminary injunction[.]" *Id*. at 1005.

The same is true here. Nothing in the requested injunction would foreclose Henryetta from pursuing a full array of crime-prevention measures within the Reservation for all offenders, while referring Indians to the Nation for prosecution precisely as contemplated by *Ute Indian Tribe*. *See* P.I. Mot. 23–24. Should the injunction issue, the only obstacle to Henryetta's doing so would be Henryetta, which has declined the Nation's repeated invitations to enter a cross-deputization agreement allowing it to do just that. *See id*. at 25. Henryetta responds to none of this and its arguments on these issues make no mention of the directly on-point *Ute Indian Tribe*.

Lacking an answer, Henryetta deflects with a fact-free disparagement of the Nation's Lighthorse police force as being of "unknown" reliability and derelict in their duties because they "could" have but "did not pull over these individuals" pulled over by Henryetta's officers, such that if an injunction issues, Indians in Henryetta will not "be required to maintain a driver's license, insurance, or to obey speed limits," Henryetta Br. 23–24.

This argument ignores that Nation law imposes all these requirements on Indian motorists, Wisner Decl. ¶ 17, and presupposes that Henryetta's unwillingness to refer Indian

---

[6] *See, e.g.*, Wasatch Appellees' Brief, *Ute Indian Tribe* (No. 14-4034), 2014 WL 4180067, at *41 ("Issuance of an injunction will cause greater harm to Wasatch County than to the Tribe because the County will be unable to protect its citizens, including tribal members, on public roads.").

9

offenders to the Nation is a legitimate stance—a proposition rejected by *Ute Indian Tribe*. Thus, even had Henryetta substantiated its alleged harms, those harms would be of Henryetta's own doing, and courts rightly "afford little weight to self-inflicted harms when conducting the balancing inquiry." *Sonic Indus. LLC v. Olympia Cascade Drive Ins LLC*, Case No. CIV-22-449, 2022 WL 3654748, at *7 (W.D. Okla. Aug. 24, 2022) (citation omitted); *see also Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Med. Ctr., LLC*, 503 F. App'x 616, 623 (10th Cir. 2012) ("[S]elf-inflicted harm can weigh in favor of granting a preliminary injunction.").

And Henryetta's stance turns reality on its head in any event, given that the Nation's Lighthorse is a highly professional and competent police force that has repeatedly expressed the desire to partner with Henryetta's police on matters of mutual importance, *see* Wisner Decl. ¶¶ 20–21; Phillips Decl. ¶¶ 2–5, just as it does to great effect with other jurisdictions within the Creek Reservation, *id.* ¶ 6. Indeed, many such partners have lauded Lighthorse as exemplary law enforcement professionals and the cooperative governance arrangements they share with the Nation as critical to successful crime prevention throughout the Reservation. *See* P.I. Mot. 23–24 & n.14; Phillips Decl. ¶ 6; Bell Decl. ¶¶ 1–11; Owen Decl. ¶¶ 1–15.

As with the Nation's showing on the merits and on irreparable harm, the balance of equities and public interest favor a preliminary injunction.

## CONCLUSION

The Nation respectfully requests that its request for a preliminary injunction be granted.

Dated: August 28, 2025

Geraldine Wisner, OBA No. 20128
Deputy Attorney General
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447
(918) 295-9720
gwisner@mcnag.com

O. Joseph Williams, OBA No. 19256
O. JOSEPH WILLIAMS LAW OFFICE, PLLC
The McCulloch Building
114 N. Grand Avenue, Suite 520
P.O. Box 1131
Okmulgee, OK 74447
(918) 752-0020
jwilliams@williamslaw-pllc.com

Respectfully submitted,

*/s/ Riyaz A. Kanji*
Riyaz A. Kanji
David A. Giampetroni
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com

Philip H. Tinker, OBA No. 36498
Stephanie R. Rush, OBA No. 34017
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Avenue, Suite 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com
vrush@kanjikatzen.com

*Counsel for Muscogee (Creek) Nation*

## CERTIFICATE OF SERVICE

I certify that on August 28, 2025, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji