# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

MUSCOGEE (CREEK) NATION,
a federally recognized Indian tribe,

*Plaintiff*,

v.

CITY OF HENRYETTA, OKLAHOMA,

*Defendant*.

Case No. 25-CV-00227-JAR

# MUSCOGEE (CREEK) NATION'S
# PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**PROPOSED FINDINGS OF FACT** .................................................................. 1

THE MUSCOGEE (CREEK) NATION IS A FEDERALLY RECOGNIZED
TRIBAL NATION WHOSE RESERVATION ENCOMPASSES THE CITY OF
HENRYETTA. ................................................................................................. 1

1.  The Muscogee (Creek) Nation ("Nation" or "MCN") is a federally recognized
    tribal nation that exercises jurisdiction over an approximately 5,000-square-mile
    Reservation encompassing all or part of eleven counties in northeastern
    Oklahoma. The United States Supreme Court's 2020 *McGirt* decision confirms
    that this Reservation has never been disestablished and accordingly remains Indian
    Country today. ........................................................................................... 1

2.  The City of Henryetta is a municipal government located wholly within the
    exterior boundaries of the Nation's Reservation. ........................................... 1

THE NATION'S LIGHTHORSE POLICE FORCE IS WELL-EQUIPPED, WELL-
TRAINED, AND HIGHLY EFFECTIVE. ......................................................... 2

3.  The Nation operated its Lighthorse Police Department and demonstrated a deep
    commitment to public safety well before *McGirt* confirmed the continued
    existence of the Nation's Reservation. ......................................................... 2

4.  The Nation has significantly increased Lighthorse's budget since *McGirt*, with the
    Nation's own revenues providing the vast majority of funding. ...................... 2

5.  Lighthorse employs 127 officers and 32 civilian employees, which represents a
    nearly three-fold increase in manpower since *McGirt* was decided. ............... 3

6.  Lighthorse has cross-deputized more than a thousand officers from other law
    enforcement agencies within the Reservation. .............................................. 3

7.  Lighthorse has specialized units and state-of-the-art equipment, including Special
    Weapons and Tactics (SWAT) equipment and a drone command center. ......... 3

8.  New Lighthorse officers receive more than seven months of high-quality training,
    including fourteen weeks of federal training not available to state and local
    officers. ................................................................................................... 4

9.  Lighthorse is highly effective in protecting public safety. ............................... 4

10. As with other offenses, Lighthorse officers take traffic violations seriously. They
    issue and enforce citations for traffic violations including speeding, driving
    without a license, and driving without insurance. Where necessary to protect
    public safety, they impound vehicles. ......................................................... 7

LIGHTHORSE MAINTAINS STRONG WORKING RELATIONSHIPS WITH OTHER POLICE DEPARTMENTS THROUGHOUT THE RESERVATION, REGULARLY RESPONDING TO REQUESTS TO PROVIDE MANPOWER AND ASSISTANCE FOR OPERATIONS AND EVENTS. ....................................................... 8

11. Lighthorse engages in collaborative operations and makes its manpower and equipment available to other departments for a variety of purposes, including responding to exigent circumstances and providing security for public events. .......... 8

12. Lighthorse assists small police departments in various other ways, including by donating equipment and transporting detainees. ............................................................ 8

13. Lighthorse does not charge other police departments for any of the support it provides. ........................................................................................................................ 9

THE NATION'S CROSS-DEPUTIZATION AGREEMENTS PROMOTE COLLABORATION BETWEEN SOVEREIGNS AND THEREBY ENHANCE PUBLIC SAFETY. ......................................................................................................... 9

14. Under the Nation's cross-deputization agreement, cross-commissioned officers can exercise policing authority over Indians and non-Indians alike. ............................. 9

15. A local police officer cross-commissioned by Lighthorse can readily cite and arrest Indians, whose cases are then handled by the Nation's Office of the Attorney General. ........................................................................................................ 10

16. After a local police officer cross-commissioned by Lighthorse arrests an Indian, the detained Indian is transferred to Lighthorse's custody. When the arresting agency is a small police department, Lighthorse generally takes charge of transporting the detainee to jail. .................................................................................. 11

17. The Nation's cross-deputization agreements contribute significantly to the ability of law enforcement authorities on the Reservation to quell criminal activity and ensure public safety. ...................................................................................................... 12

18. The Nation has cross-deputization agreements with sixty-four law enforcement agencies that operate within the Reservation, including small police departments of similar size to Henryetta's. Only three local police departments within the Reservation have not entered cross-deputization agreements with Lighthorse, one of which is the Henryetta Police Department. ............................................................. 14

19. The Nation would readily enter a cross-deputization agreement with Henryetta on the same terms as it has with the other sixty-four law enforcement agencies with whom it has cross-deputization agreements. ............................................................. 14

THE NATION'S OFFICE OF THE ATTORNEY GENERAL AND DISTRICT COURT SYSTEM ARE WELL-RESOURCED AND FULLY CAPABLE OF EXERCISING CRIMINAL JURISDICTION OVER INDIANS ON THE RESERVATION. ................................................................................. 15

20. The Nation has significantly increased the budget for the Nation's Office of the Attorney General and District Court since *McGirt*, with the Nation's own revenues providing the vast majority of funding. ...................................................... 15

21. The Nation's prosecutorial capacity has increased significantly since *McGirt*, and the Nation is fully capable of prosecuting cases involving Indians referred to it by state and local police departments. ............................................................. 16

22. The Nation's Office of the Attorney General has highly cooperative relationships with other law enforcement agencies on the Reservation through which jurisdictional issues are successfully addressed. .......................................................... 16

23. The Nation has a modernized court system in which defendants' rights are fully protected, and court facilities and technology enable the efficient administration of justice. ...................................................................................................... 17

24. The Nation's District Court has substantially increased its staffing since *McGirt* was decided, more than doubling the number of judges and non-judge court personnel. ................................................................................................... 18

25. The Nation's District Court has increased its capacity substantially since *McGirt* was decided. It now handles more than 1,000 felony charges and more than 2,200 traffic citations annually—a figure that will further increase now that the City of Tulsa and the City of Okmulgee have agreed to refer traffic citations to the Nation. . 19

26. The Nation's District Court requires pre-trial detention and imposes prison sentences as needed to protect public safety, including for serious traffic offenses. .. 20

THE NATION SEEKS TO EXERCISE ITS CRIMINAL JURISDICTION IN A MANNER CONSISTENT WITH THE NATION'S VALUES AND PRIORITIES. ...... 20

27. The Nation's Lighthorse Police Department aims to treat everyone in the community—including victims and suspects—with respect and courtesy. ............... 20

28. When a Lighthorse officer acts below standards (including when policing in Henryetta), he is subject to significant discipline. ...................................................... 21

29. The Nation's Office of the Attorney General provides professional support to victims and witnesses of crime. .................................................................................. 21

30. Lighthorse officers, Nation prosecutors, and Nation judges take financial hardship into account in their treatment of offenders. The Nation does not rely on fines and fees to fund its courts or Office of the Attorney General. ........................................... 22

31. Where consistent with public safety, the Nation seeks to provide offenders with substance abuse treatment and mental health treatment as alternatives to incarceration or as conditions of parole. ...................................................................... 22

32. Where consistent with public safety, the Nation seeks to support the reintegration of offenders so that they can remain contributing members of the Reservation community. ................................................................................................................. 24

THE NATION AND HENRYETTA CAN PROTECT PUBLIC SAFETY WITHOUT HENRYETTA UNILATERALLY ASSERTING CRIMINAL JURISDICTION OVER INDIANS. .............................................................................................................. 25

33. The Nation incorporates state and local criminal law into the Nation's criminal code, such that in Henryetta substantially the same criminal laws apply to Indians as apply to non-Indians. ............................................................................................... 25

34. The Henryetta Police Department and the Nation are capable of protecting public safety in Henryetta without Henryetta unilaterally exercising criminal jurisdiction over Indians. Lighthorse officers regularly pass through Henryetta or patrol in the area. For an emergency call from Henryetta, Lighthorse officers arrive in fifteen minutes or less. ......................................................................................................... 26

35. Henryetta has shown itself to be capable of calling on Lighthorse to respond to calls involving Indian suspects, and in doing so the Henryetta and Lighthorse officers have generally developed positive relationships. ........................................... 27

36. To the extent Henryetta has concerns about Lighthorse's response times or manpower in Henryetta, it could resolve those concerns by accepting the Nation's offer to enter a cross-deputization agreement. ............................................................. 28

HENRYETTA'S ASSERTION OF CRIMINAL JURISDICTION OVER INDIANS HAS NOT SERVED THE INTEREST OF PUBLIC SAFETY. ..................................... 29

37. After *McGirt*, Henryetta has continued to issue citations and prosecute both MCN citizens and non-member Indians within the Reservation. .......................................... 29

38. For traffic violations and other municipal violations for which Henryetta can obtain revenue, certain Henryetta officers have aggressively policed Indians and Henryetta has prosecuted Indians with little regard for their wellbeing or financial situation. .................................................................................................................. 29

39. Where Henryetta clearly *does* have jurisdiction over incidents involving Indians—such as situations in which Indians need emergency medical assistance or are victims of crimes by non-Indians—Henryetta has refused to help MCN citizens and non-member Indians who call for help. Even during the pendency of this case, the Henryetta Police Department has refused to come to the aid of Indians. ............. 30

40. Henryetta's decision to police and prosecute Indians while refusing to enter a standard cross-deputization agreement is motivated in substantial part by a desire to collect revenue. ...................................................................................................... 32

41. In the absence of a court order, nothing will prevent Henryetta from continuing to arrest, ticket, and prosecute both MCN citizens and non-member Indians. ............... 32

HENRYETTA'S ASSERTION OF CRIMINAL JURISDICTION OVER INDIANS INTERFERES WITH THE NATION'S SOVEREIGNTY IN SIGNIFICANT PRACTICAL WAYS. ...................................................................................................... 33

42. As recognized by Congress when adopting its *Duro* fix legislation, the exercise of authority over non-member Indians implicates tribal sovereignty because non-member Indians are deeply intertwined in reservation Indian communities, including that of the Nation. Many non-member Indians reside on and own property on the reservation, are intermarried with and raise children with MCN citizens, work for the Nation, receive services from the Nation, and/or come from tribes with a history and land base intertwined with the Nation's. ............................. 33

43. Henryetta's assertion of criminal jurisdiction over MCN citizens and other Indians interferes with the Nation's sovereignty in significant practical ways. It results in unnecessarily aggressive policing that is inconsistent with Lighthorse's approach to law enforcement; usurps the Nation's decision-making regarding the appropriate punishments to seek and administer; and denies the Nation the opportunity to provide services to victims and defendants. ......................................... 35

**PROPOSED CONCLUSIONS OF LAW** ................................................................**37**

STANDING AND MOOTNESS ........................................................... 37

1.  The Muscogee (Creek) Nation ("Nation" or "MCN") has standing to bring this
    action because the City of Henryetta's assertion of criminal jurisdiction over
    Indians within the Nation's Reservation constitutes a concrete injury to the
    Nation's sovereignty that is fairly traceable to Henryetta's actions and would be
    redressed by a favorable decision of this Court. ........................................................... 37

2.  The Nation's claims are not moot because absent a court order, nothing will
    prevent Henryetta from continuing to arrest, ticket, and prosecute both MCN
    citizens and non-member Indians. Henryetta stipulated to stop prosecuting MCN
    citizens only until the Nation's preliminary injunction motion is decided or upon
    further order from this Court, and to stop prosecuting non-member Indians only
    through October 7, 2025. Moreover, it has not agreed to any limitations on its
    policing of either MCN citizens or non-member Indians. ........................................... 38

PRINCIPLES REGARDING GOVERNING LAW .......................................... 39

3.  The precedents of the United States Supreme Court and the Tenth Circuit remain
    binding unless expressly overruled. ............................................................................ 39

4.  The Court owes no deference to State courts on issues of federal law. ...................... 40

STANDARD FOR GRANTING RELIEF ....................................................... 40

5.  The Nation is entitled to a preliminary injunction because it has established that it
    is likely to succeed on the merits of its claim, that it will suffer irreparable harm in
    the absence of preliminary relief, that the balance of equities tips in its favor, and
    that issuance of an injunction is in the public interest. ................................................ 40

LIKELIHOOD OF SUCCESS ON THE MERITS .......................................... 41

6.  The United States Supreme Court's decision in *McGirt* recognizes that the
    Nation's Reservation has never been disestablished and accordingly remains
    Indian Country today. ................................................................................................. 41

7.  The Nation's Reservation remains Indian country for all purposes, not just for
    purposes of the Major Crimes Act. ............................................................................ 41

8.  Under Supreme Court and Tenth Circuit precedent, the State of Oklahoma and its
    political subdivisions, including the City of Henryetta, lack jurisdiction to
    prosecute Indians for conduct within Indian country. ................................................ 42

9.  Under those precedents, Henryetta lacks criminal jurisdiction over *all* Indians, not just MCN citizens.............................................................................................. 44

10. Even if the question of state criminal jurisdiction over Indians in Indian Country were not settled under long-standing precedent, *Bracker* balancing would be inapplicable because it pertains only to assertions of state jurisdiction over *non*-Indians. ................................................................................................................... 46

11. As a matter of constitutional design rather than balancing, states are preempted from asserting jurisdiction over Indians absent congressional authorization. ............. 47

12. Judicial balancing would be especially inappropriate here, where Congress has clearly determined that States cannot extend jurisdiction over Indians in Indian country absent tribal consent. .................................................................................. 47

IRREPARABLE HARM .................................................................................... 49

13. Henryetta's unauthorized policing and prosecution of Indians within the Nation's Reservation constitute an invasion of the Nation's sovereignty and accordingly inflict irreparable injury on it. ................................................................................ 49

BALANCE OF HARMS AND THE PUBLIC INTEREST ............................................ 50

14. The Nation has highly significant self-governance interests in developing and strengthening its sovereign institutions and applying its own laws and policies to Indians within the Reservation.................................................................................. 50

15. Henryetta's countervailing concerns are due no weight because: Henryetta's exercise of criminal jurisdiction over Indians is not necessary to protect public safety; any negative consequences of not entering a cross-deputization agreement amount to self-inflicted harm; and Henryetta has no entitlement to exercise jurisdiction over Indians in the first place.................................................................. 50

## PROPOSED FINDINGS OF FACT - ANNOTATED

**THE MUSCOGEE (CREEK) NATION IS A FEDERALLY RECOGNIZED TRIBAL NATION WHOSE RESERVATION ENCOMPASSES THE CITY OF HENRYETTA.**

1. **The Muscogee (Creek) Nation ("Nation" or "MCN") is a federally recognized tribal nation that exercises jurisdiction over an approximately 5,000-square-mile Reservation encompassing all or part of eleven counties in northeastern Oklahoma. The United States Supreme Court's 2020 *McGirt* decision confirms that this Reservation has never been disestablished and accordingly remains Indian Country today.**

   EVIDENCE:

   Treaty with the Creeks art. XIV, Mar. 24, 1832, 7 Stat. 366 (guaranteeing to the Nation lands west of the Mississippi, over which they were promised the right of self-government)

   Treaty with the Creeks art. II, Feb. 14, 1833, 7 Stat. 417 (establishing original boundaries of the Nation's Reservation)

   Treaty with the Creeks arts. III, XII, June 14, 1866, 14 Stat. 785 (ceding certain Reservation lands to the United States while reaffirming prior Treaty provisions and establishing the Reservation's present-day boundaries)

   *McGirt v. Oklahoma*, 591 U.S. 894, 937 (2020) ("The federal government promised the Creek a reservation in perpetuity.... Congress has never withdrawn the promised reservation.")

   Testimony of Lighthorse Police Chief Richard Phillips at 94:14-19 (explaining that the Nation's Reservation covers approximately 5,000 square miles encompassing all or part of eleven counties in northeastern Oklahoma)

2. **The City of Henryetta is a municipal government located wholly within the exterior boundaries of the Nation's Reservation.**

   EVIDENCE:

   Complaint (Dkt. 2) ¶ 12; *see also* Answer of City of Henryetta (Dkt. 75) ¶ 12 (admitting same)

1

**THE NATION'S LIGHTHORSE POLICE FORCE IS WELL-EQUIPPED, WELL-TRAINED, AND HIGHLY EFFECTIVE.**

3. **The Nation operated its Lighthorse Police Department and demonstrated a deep commitment to public safety well before *McGirt* confirmed the continued existence of the Nation's Reservation.**

   EVIDENCE:

   *McGirt v. Oklahoma*, 591 U.S. 894, 912 (2020) ("Today the Nation is led by a democratically elected Principal Chief, Second Chief, and National Council; operates a police force and three hospitals; commands an annual budget of more than $350 million; and employs over 2,000 people. Brief for Muscogee (Creek) Nation as *Amicus Curiae* 36–39. In 1982, the Nation passed an ordinance reestablishing the criminal and civil jurisdiction of its courts. See *Hodel*, 851 F.2d at 1442, 1446–1447 (confirming Tribe's authority to do so). The territorial jurisdiction of these courts extends to any Indian country within the Tribe's territory as defined by the Treaty of 1866. MCN Stat. 27, § 1-102(A).")

   MCN.Ex.48, *MCN Summary: Budgets* (summary exhibit based on MCN.Ex.45, MCN.Ex.46, and MCN.Ex.47, showing that in fiscal year 2019, before *McGirt*, the Nation expended $1,021,966 on the MCN District Court, $2,395,072 on the Office of the Attorney General, and $4,623,768 on the Lighthorse Police Department)

   Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 3 ("The City of Okmulgee and the Muscogee (Creek) Nation have had a cross-deputization agreement since 2002.")

4. **The Nation has significantly increased Lighthorse's budget since *McGirt*, with the Nation's own revenues providing the vast majority of funding.**

   EVIDENCE:

   MCN.Ex.48, *MCN Summary: Budgets* (summary exhibit based on MCN.Ex.45, MCN.Ex.46, and MCN.Ex.47, showing, inter alia, that Lighthorse Police Department expenditures increased from $4,623,768 in fiscal year 2019 to $21,471,413 as of October 1 in fiscal year 2025, and that the vast majority of funding is appropriated by the Nation from its own revenues rather than provided by the federal government)

   MCN.Ex.47, *MCN Lighthorse Budget Documents*

   Testimony of Secretary of the Nation Zechariah Harjo at 22:5-18 (explaining that "self-governance" funds are a form of federal funding); *id.* at 27:7-16 (explaining that MCN.Ex.48 shows, inter alia, the relative contribution of tribal and federal funds to Lighthorse from 2019 through 2025, and that for all years "tribal expenditures far exceeded the self-governance expenditures")

2

5. **Lighthorse employs 127 officers and 32 civilian employees, which represents a nearly three-fold increase in manpower since *McGirt* was decided.**

   <u>EVIDENCE</u>:

   Testimony of Lighthorse Police Chief Richard Phillips at 48:25–49:6 (testifying that there were "approximately 59" Lighthorse employees in July 2020, and the number of employees has "almost tripled" since then)

   MCN.Ex.28, *Lighthorse Personnel Listing*, at 1 (listing 159 current Lighthorse employees, consisting of 127 officers and 32 civilian employees); *see also* Testimony of Lighthorse Police Chief Richard Phillips at 50:1-6 (testifying about figures in MCN.Ex.28)

   Testimony of Lighthorse Police Chief Richard Phillips at 51:1-6 ("Q. Does Lighthorse intend to hire more than the 159 employees it currently has? A. Yes. As you can see, I have approximately nine openings there. I look to fill those hopefully rather quickly. Once those are filled, I hope to add on more officers and employees.")

   Testimony of Lighthorse Police Chief Richard Phillips at 51:7-16 (describing success since *McGirt* in recruiting applicants to Lighthorse)

6. **Lighthorse has cross-deputized more than a thousand officers from other law enforcement agencies within the Reservation.**

   <u>EVIDENCE</u>:

   Testimony of Lighthorse Police Chief Richard Phillips at 50:22-25

7. **Lighthorse has specialized units and state-of-the-art equipment, including Special Weapons and Tactics (SWAT) equipment and a drone command center.**

   <u>EVIDENCE</u>:

   Testimony of Lighthorse Police Chief Richard Phillips at 49:7-13 (describing investments in Lighthorse since *McGirt*, including a "mounted patrol program, we have a drone program, we have a search and rescue, dive, our K-9s have grown. We've grown exponentially across Lighthorse Police Department")

   Testimony of Lighthorse Police Chief Richard Phillips at 53:12–57:1 (discussing the work of patrol officers, dispatchers, investigators, SWAT team members, drone operators, and Critical Incident Team members)

   MCN.Ex.29, *MCN Lighthorse Photos*, at 001–007 (photographs of Lighthorse at work)

3

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 7 ("The Lighthorse Police are a highly professional, effective, and technologically advanced department. Lighthorse officers have spent time building relationships with Coweta officers and learned our procedures to ensure that when they come to our area, they can support the Coweta Police as effectively as possible.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 8 ("Lighthorse additionally has equipment, training, and personnel that a small police department like ours could never afford.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 10 ("Lighthorse also helps us by deploying equipment that our department does not have. Lighthorse's large mobile command truck is useful when we are going to be at a scene for a long time. Their drone command center is also very advanced, and they regularly use their drone capability to help with security at big events[.]")

8. **New Lighthorse officers receive more than seven months of high-quality training, including fourteen weeks of federal training not available to state and local officers.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 51:17–52:24 (describing training quality and requirements, including fourteen weeks at the Federal Law Enforcement Training Center in New Mexico, three weeks at the Council on Law Enforcement Education and Training in Oklahoma, and at least thirteen weeks of field training with a Lighthorse officer)

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 8 ("Lighthorse additionally has equipment, training, and personnel that a small police department like ours could never afford.")

9. **Lighthorse is highly effective in protecting public safety.**

EVIDENCE:

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 7 ("The Lighthorse Police are a highly professional, effective, and technologically advanced department. Lighthorse officers have spent time building relationships with Coweta officers and learned our procedures to ensure that when they come to our area, they can support the Coweta Police as effectively as possible.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 8 ("Lighthorse additionally has equipment, training, and personnel that a small police department like ours could never afford. For example, last year my department was investigating an

armed robbery. We identified a suspect and where he lived, and once we obtained an arrest warrant, my next call was to Lighthorse to get the support of their SWAT team. Within 30 minutes, they were at my office with manpower, drones, and vehicles that my department does not have. The result of our collaboration was a success: we took the suspect into custody without any harm to anybody.")

Testimony of Coweta Police Chief Michael Bell at 122:11–123:8 (elaborating on the collaboration described in ¶ 8 of his declaration (Dkt. 51), in which Lighthorse SWAT provided prompt and successful support in capturing armed robbery suspect)

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 9 ("We have also called upon Lighthorse to assist us with rescue operations. We have had incidents where children may have run away from their homes or otherwise gone missing. In these cases, we call Lighthorse, who are always able to provide manpower and equipment to assist in these operations. Lighthorse's mobile drone command unit, in particular, has been enormously helpful in finding those kids.")

Testimony of Coweta Police Chief Michael Bell at 121:19–122:1 ("[A]ny time that we have a situation in Coweta where they may need backup, it seems like the Lighthorse Police are the ones that are closest by, and they seem to get there the quickest. Not saying anything bad about Wagoner County, but they're just as busy and just as short manned as anybody else is. So it's definitely nice to have some extra police officers in the area.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 6 ("Lighthorse is extremely helpful in responding to calls, policing large events, and providing security at crime scenes.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 7 ("We have such a good relationship with Lighthorse that they monitor our radio traffic and show up at crime scenes without us even having to ask for their support. Their response time is very good. When our officers respond to a call, Lighthorse officers often arrive at the same time.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 8 ("For example, earlier this year, we got a call reporting a home invasion where someone had been shot. Lighthorse showed up at the scene to help before we even requested their assistance, and they immediately began working with us on investigating the case. Our collaboration with Lighthorse on this case resulted in arrests of both tribal and non-tribal suspects. That is just one example that comes to mind, but there are numerous examples where Lighthorse and our officers have worked effectively together at investigating and apprehending suspects, in both routine and high-intensity situations.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 9 ("For large events, such as the Okmulgee Invitational Rodeo that thousands of people recently attended,

we prepare public safety plans with Lighthorse. Working with them ensures a bigger and well-coordinated law enforcement presence at these events.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 10 ("Lighthorse also helps us by deploying equipment that our department does not have. Lighthorse's large mobile command truck is useful when we are going to be at a scene for a long time. Their drone command center is also very advanced, and they regularly use their drone capability to help with security at big events, such as the recent Okmulgee Invitational Rodeo, at which Lighthorse deployed its drone unit to assist both the Okmulgee and Lighthorse officers with monitoring the crowds and parking areas to identify and respond to any public safety concerns in real time.")

MCN.Ex.29, *MCN Lighthorse Photos*, at 010 (photograph of Lighthorse Police Chief Richard Phillips with Special Agent Ashley Stephens at the United States Attorney's Office for the Eastern District of Oklahoma)

Testimony of Lighthorse Police Chief Richard Phillips at 58:12–59:3 (explaining that photo in MCN.Ex.29 at 010 is from an event in September 2025 at which the United States Attorney's Office for the Eastern District of Oklahoma recognized Lighthorse for successfully collaborating with federal law enforcement to get illegal firearms and drugs off the streets)

MCN.Ex.34, *MCN Lighthorse Special Operations Log* (documenting sixteen SWAT team operations from April 2024 to August 2025 in which Lighthorse collaborated with federal, state, or local law enforcement agencies)

Testimony of Lighthorse Police Chief Richard Phillips at 60:24–61:14 (discussing operations log for Lighthorse SWAT operations (MCN.Ex.34) and explaining that these operations are generally collaborative with other law enforcement agencies, such as when Lighthorse worked with the U.S. Marshal's office to arrest a barricaded subject in Henryetta)

Declaration of Muscogee (Creek) Nation Lighthorse Police Chief Richard Phillips (Dkt. 50) ¶ 6 ("I regularly hear praise and commendations from state, county, and local law enforcement officials and agencies regarding the dedication and professionalism that my Lighthorse officers bring to each and every service call and joint operation with our partner jurisdictions, and how beneficial it is to our shared law enforcement goals to be able to call upon Lighthorse's personnel and resources whenever we can be of assistance with their operations or investigations.")

10. **As with other offenses, Lighthorse officers take traffic violations seriously. They issue and enforce citations for traffic violations including speeding, driving without a license, and driving without insurance. Where necessary to protect public safety, they impound vehicles.**

EVIDENCE:

Testimony of Deputy Attorney General Geraldine Wisner at 159:10–160:23 (explaining that the Nation has adopted its own comprehensive traffic code that incorporates substantially the same traffic laws in effect throughout the State of Oklahoma, and additionally has adopted a Supplemental Crimes Act that incorporates Oklahoma's criminal laws with respect to offenses that are not otherwise covered by the Nation's existing criminal laws, in order to ensure that the Nation's criminal laws are comprehensive with respect to traffic and other criminal offenses)

Tribal Code of the Muscogee (Creek) Nation tit. 14, ch. 2, subch. 1, §2-114, Supplemental Crimes Act, https://law.muscogeenation.com/mvskokelaw/title-14/title-14-chapter-2-criminal-offenses

Tribal Code of the Muscogee (Creek) Nation tit. 14, ch. 3, Muscogee (Creek) Nation Traffic Code, https://law.muscogeenation.com/mvskokelaw/title-14/title-14-chapter-3-muscogee-creek-nation-traffic-code

Testimony of Lighthorse Police Chief Richard Phillips at 71:23–72:6 (explaining that Lighthorse officers issue citations for speeding, driving without a license, and driving without insurance)

Testimony of Lighthorse Police Chief Richard Phillips at 72:16–19 (stating that Lighthorse has impounded vehicles given public safety concerns)

Henryetta Ex. 5, *Henryetta Body Cam Footage of Stop of Brandon Britt on September 29, 2025*, at 18:18:54–18:19:10 (Lighthorse officer explaining to suspect that she will need to impound his vehicle)

Henryetta Ex. 3*, Henryetta Police Department Radio Log of Stop of Brandon Britt on September 29, 2025*, at 1 ("LH RELEASED THE DRIVER WITH CITATIONS AND TOWED THE VEHICLE")

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 27 ("The Nation's modern criminal justice system is modeled on and encompasses all the features commonly employed in state and federal justice systems, including incarceration, vehicle impoundment, and/or criminal fines and monetary penalties where appropriate.")

*See supra* MCN Proposed Finding of Fact 9 (citing evidence and testimony regarding Lighthorse's effectiveness and successful collaborations with local, state, and federal

law enforcement in SWAT operations, criminal investigations, responding to 911 calls, search and rescue, and event security)

**LIGHTHORSE MAINTAINS STRONG WORKING RELATIONSHIPS WITH OTHER POLICE DEPARTMENTS THROUGHOUT THE RESERVATION, REGULARLY RESPONDING TO REQUESTS TO PROVIDE MANPOWER AND ASSISTANCE FOR OPERATIONS AND EVENTS.**

11. **Lighthorse engages in collaborative operations and makes its manpower and equipment available to other departments for a variety of purposes, including responding to exigent circumstances and providing security for public events.**

    EVIDENCE:

    *See supra* MCN Proposed Finding of Fact 9 (citing evidence and testimony from multiple witnesses regarding Lighthorse's successful collaborations with local, state, and federal law enforcement in SWAT operations, criminal investigations, routine 911 calls, search and rescue, and event security)

12. **Lighthorse assists small police departments in various other ways, including by donating equipment and transporting detainees.**

    EVIDENCE:

    Testimony of Lighthorse Police Chief Richard Phillips at 57:23–58:11, 60:9-23 (discussing how Lighthorse works to bolster the manpower and equipment available to small departments throughout the Reservation, including the example of Lighthorse's donation of a police vehicle to the Weleetka Police Department)

    MCN.Ex.29, *MCN Lighthorse Photos*, at 009 (photograph of Lighthorse Police Chief Richard Phillips and the Chief of the Weleetka Police Department in front of a police vehicle donated to the Weleetka Police Department by Lighthorse)

    Testimony of Lighthorse Police Chief Richard Phillips at 68:14–69:9 (explaining that after a cross-commissioned agency effects an arrest, the detainee is transferred to Lighthorse, and Lighthorse generally takes care of transport when the arresting agency is a small police department)

    Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 10 ("The Nation is also very quick to act when we have a tribal member in custody. We do not have a jail, so we can only hold people for a maximum of twelve hours in our holding center. Lighthorse consistently arrives to pick up detainees and transport them to jail within one to two hours, which is significantly faster than most agencies we work with. Lighthorse also handles the transportation, which is a big help for a small department

8

like ours because we do not have enough officers to transport detainees to other jurisdictions regularly.")

13. **Lighthorse does not charge other police departments for any of the support it provides.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 63:16-19 ("Q. … When you lend equipment to another department or assist in police operations, do you send a bill? A. No, sir.")

Testimony of Coweta Police Chief Michael Bell at 123:22–124:2 ("Q. Has Lighthorse ever asked for financial compensation when it provided SWAT support or helped out with security at an event? A. No. Q. Has Lighthorse ever sent you a bill for anything? A. No.")

**THE NATION'S CROSS-DEPUTIZATION AGREEMENTS PROMOTE COLLABORATION BETWEEN SOVEREIGNS AND THEREBY ENHANCE PUBLIC SAFETY.**

14. **Under the Nation's cross-deputization agreement, cross-commissioned officers can exercise policing authority over Indians and non-Indians alike.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 63:20–64:17 (explaining how MCN cross-deputization agreements work)

MCN.Ex.37, *MCN Master Cross-Deputization Agreement*, at 008–009 ("Officers of the BIA and State who receive commissions from the Nation shall have authority to respond to observed violation[s] of the Nation's Criminal Code, and upon request by Officers of the Nation, investigate offenses and enforce the criminal laws enumerated in the Nation's Criminal Code and/or other criminal laws of the Nation"; "Officers [of] the Nation and the BIA who receive commissions from the State shall have authority to react to observed violations of the State's criminal laws, and upon request by Officer[s] of a State Agency, investigate offenses and enforce the criminal laws enumerated in the Oklahoma Statutes and/or other laws of the State."); *id.* at 003 (defining "State" to include "a political subdivision of the State of Oklahoma, including counties and municipalities")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 4 ("Nearly all Okmulgee Police Department officers are commissioned by Lighthorse, and all Lighthorse officers who patrol in the area of Okmulgee—as well as Lighthorse's criminal division investigators and K9 officers—are commissioned by Okmulgee. As

a result, officers for both the Okmulgee Police and Lighthorse Police have the authority to arrest, search, detain, and investigate all suspects within the City of Okmulgee.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 3 ("This cross-deputization agreement ensures that every police officer—whether Coweta Police or Lighthorse Police—has authority to arrest, search, detain, and investigate all suspects within Coweta. If we believe a suspect or detainee is a citizen of a tribe, we then send the case to the Nation for prosecution. If Lighthorse has a suspect or detainee who is not a member of a tribe, it will send the case to the Wagoner County District Attorney or the Coweta City Attorney.")

15. **A local police officer cross-commissioned by Lighthorse can readily cite and arrest Indians, whose cases are then handled by the Nation's Office of the Attorney General.**

EVIDENCE:

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 3 ("If we believe a suspect or detainee is a citizen of a tribe, we then send the case to the Nation for prosecution. If Lighthorse has a suspect or detainee who is not a member of a tribe, it will send the case to the Wagoner County District Attorney or the Coweta City Attorney.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 5 ("When Coweta officers write up a traffic ticket for a member of a tribe, the case goes to the Nation to be processed by the tribal court system. When Lighthorse writes up a ticket for a non-Indian, the case goes to the municipal court system. We have received very positive feedback from the community about this process, and it has been my experience that tribal citizens appreciate knowing that we work with Lighthorse and the Nation's prosecutor's office to ensure that cases involving tribal citizens are handled appropriately under the law.")

Testimony of Coweta Police Chief Michael Bell at 114:1–117:18 (explaining that Coweta officers can issue a tribal ticket for an Indian by checking a box in their digital ticket-writing interface, that the digital ticketing system will then input the tribal court date and address on the ticket, and that Coweta officers do not need to know the Nation's traffic code to issue a ticket because the Nation's Office of the Attorney General translates the relevant provision of the state traffic code into the corresponding provision of Nation law)

MCN.Ex.40, *Coweta PD Ticket Interface* (showing Coweta officers' digital interface for issuing traffic tickets, including box to check to make the ticket a tribal ticket)

MCN.Ex.41, *Coweta and MCN Tickets* (showing local and tribal tickets created by Coweta officers' digital ticketing system, with the tickets nearly identical except for the court date and address)

Testimony of Coweta Police Chief Michael Bell at 118:2-24 (explaining process for arresting someone suspected of DUI and explaining that it is even easier for a Coweta officer to arrest an Indian than a non-Indian because Lighthorse will come pick up the individual and transport the individual to jail)

Testimony of Coweta Police Chief Michael Bell at 118:25–119:6 (stating that Coweta officers have arrested and transferred to Lighthorse approximately fifty Indians within the past year, including both MCN citizens and non-member Indians)

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 12 ("Under the cross-deputization agreements, the investigation and prosecution of crimes is generally carried out seamlessly. Whether the investigation is conducted by Okmulgee or Lighthorse officers—and in many instances, it is done through the cooperation of both agencies—officers in the field can focus on completing their job safely and effectively, without needing to worry about jurisdictional boundaries. Once the investigation is concluded, the officers will submit the report and evidence to the appropriate jurisdiction to prosecute.")

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 17 ("Non-Nation officers are not required to learn or apply the Nation's criminal or traffic code when issuing citations to Nation citizens or other Indians. Following the *McGirt* decision, the Nation revised its traffic code to mirror Oklahoma's traffic code, in order to promote uniformity and minimize any jurisdictional confusion on the part of motorists or officers enforcing the laws.")

Testimony of Lighthorse Police Chief Richard Phillips at 68:14–69:9 (explaining that a local officer cross-commissioned by Lighthorse does not need to know the Nation's traffic code to write a ticket for an Indian, and it is no more difficult to write a ticket for an Indian than for a non-Indian)

16. **After a local police officer cross-commissioned by Lighthorse arrests an Indian, the detained Indian is transferred to Lighthorse's custody. When the arresting agency is a small police department, Lighthorse generally takes charge of transporting the detainee to jail.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 68:14–69:9 (explaining that after a cross-commissioned agency effects an arrest, the detainee is transferred to Lighthorse, and Lighthorse generally takes care of transport when the arresting agency is a small police department)

11

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 10 ("The Nation is also very quick to act when we have a tribal member in custody. We do not have a jail, so we can only hold people for a maximum of twelve hours in our holding center. Lighthorse consistently arrives to pick up detainees and transport them to jail within one to two hours, which is significantly faster than most agencies we work with. Lighthorse also handles the transportation, which is a big help for a small department like ours because we do not have enough officers to transport detainees to other jurisdictions regularly.")

17. **The Nation's cross-deputization agreements contribute significantly to the ability of law enforcement authorities on the Reservation to quell criminal activity and ensure public safety.**

EVIDENCE:

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 5 ("Using our cross-deputization agreement with the Muscogee (Creek) Nation is in the best interest of public safety and the citizens we serve. It is a force-multiplier that significantly improves the number of officers and the equipment available for law enforcement in Okmulgee, and allows us to serve the community in a more efficient and effective manner.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 15 ("Lighthorse Police Chief Phillips and I share the overarching goal of creating an environment where our officers remain dedicated to ensuring the safety of the public as well as themselves, investigating criminal conduct, preventing violence and harm to the public, and detecting and prosecuting those who commit violence and break the laws. Our partnership as cross-commissioned law enforcement agencies help us to achieve these goals, and in my experience this arrangement has worked out tremendously well for the City of Okmulgee.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 2 (describing cross-deputization agreement as "a no-brainer")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 11 ("The responsiveness and capacity of law enforcement in Coweta is stronger than it has ever been. Entering a cross-deputization agreement with the Nation was like doubling my police force without having to pay for it. Our partnership with Lighthorse under the cross-deputization agreement has brought tremendous benefits to the City of Coweta and my department, and I am grateful for that partnership in enforcing the laws and protecting all citizens within the City.")

Testimony of Coweta Police Chief Michael Bell at 124:5–126:15 (explaining that "I went from 18 officers on the street to an extra 20 officers that I just cross-deputized with the Muscogee Nation, so it's almost doubled my force," that he has observed a

substantial decline in crime since *McGirt*, and that his observations on the ground are consistent with the decline in crime discussed in MCN.Ex.42)

MCN.Ex.42, *Fox 23 (Sept. 10, 2025)*, at 001 (news article describing 35% decline in violent crime and property crime over the last eight years in Wagoner County (where the district attorney is not asserting concurrent jurisdiction and where local police departments such as Coweta have cross-deputization agreements, *see* Hearing Tr. at 124:10–125:17))

Testimony of Lighthorse Police Chief Richard Phillips at 68:3-13 (giving example of Weleetka police department with four officers that has cross-commissioned the fifteen MCN officers who patrol in that area of the Reservation)

Testimony of Lighthorse Police Chief Richard Phillips at 75:19-23 ("Q. If there were a cross-deputization agreement, how would that affect response times [in Henryetta]? A. It would be almost non-existent because they're right there. They're there in town. So they can handle whatever situation should come up.")

Declaration of Muscogee (Creek) Nation Lighthorse Police Chief Richard Phillips (Dkt. 50) ¶ 5 ("[T]he City of Henryetta would not need to rely exclusively on the Nation's Lighthorse Police Department to respond to law enforcement incidents involving citizens of Tribal nations, if the City would accept the Nation's offer to enter into a cross-deputization agreement, which would allow officers for both the Nation and the City to respond to any call for service or law enforcement incident, regardless of the individual's status as a tribal citizen or non-Indian.")

Declaration of Muscogee (Creek) Nation Lighthorse Police Chief Richard Phillips (Dkt. 50) ¶ 6 ("Jurisdictions that have entered into agreements with the Nation can enforce their laws and the Nation's seamlessly regardless of the suspect's tribal status, and our agencies are able to work together effectively and cooperatively to ensure public safety, investigate criminal activities, and find and arrest suspects who are then referred to the appropriate jurisdiction for prosecutions.")

*See supra* MCN Proposed Finding of Fact 9 (citing evidence and testimony from multiple witnesses regarding Lighthorse's successful collaborations with local, state, and federal law enforcement in SWAT operations, criminal investigations, routine 911 calls, search and rescue, and event security)

Hearing Transcript at 273:21-25 ("[MR NOWLIN:] Why are cross-deputization agreements even discussed in this case? They are obviously good policy. They're obviously a good idea. Federal and state agencies cross-deputize. It's not unheard of.")[1]

---

[1] Recognizing that closing argument is not evidence, the Nation cites to argument by opposing counsel only where factual concessions were made.

13

18. **The Nation has cross-deputization agreements with sixty-four law enforcement agencies that operate within the Reservation, including small police departments of similar size to Henryetta's. Only three local police departments within the Reservation have not entered cross-deputization agreements with Lighthorse, one of which is the Henryetta Police Department.**

EVIDENCE:

MCN.Ex.36, *MCN Cross-Deputization Agreements List*

Testimony of Lighthorse Police Chief Richard Phillips at 66:1-13 (testifying that Lighthorse has sixty-four cross-deputization agreements and that the only police departments within the Reservation that do not have cross-deputization agreements are the Okmulgee County Sheriff's Office, the Mayes County Sheriff's Office, and the Henryetta Police Department)

Testimony of Henryetta Police Chief Steve Norman at 238:6-9 ("Q. And among the list of 64 police departments that have cross-deps with the Nation, some of those are similarly small like your department, right? A. Hm-mm.")

19. **The Nation would readily enter a cross-deputization agreement with Henryetta on the same terms as it has with the other sixty-four law enforcement agencies with whom it has cross-deputization agreements.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 89:2-19 (explaining that he previously reached out to the Chief of the Henryetta Police Department about entering a cross-deputization agreement and did not get a response, and stating that he would "absolutely" like to enter a cross-deputization agreement with Henryetta)

Testimony of Deputy Attorney General Geraldine Wisner at 158:17–159:1 (testifying that the Nation invited Henryetta to enter into a cross-deputization agreement but Henryetta has not entered into such an agreement)

MCN.Ex.71, *G. Wisner Letter to J. Insabella (Sept. 23, 2024)* (letter from Deputy Attorney General Wisner to City Attorney Insabella inviting Henryetta to enter into a cross-deputization agreement)

Testimony of Deputy Attorney General Geraldine Wisner at 160:24–161:7 ("Q. If Henryetta had any concerns regarding the ability of Lighthorse to fully patrol the city and respond to all crimes committed by member and non-member Indians, could those concerns be addressed by entering into a cross-deputization agreement? A. They definitely would. Q. And the Nation would be willing to enter into one with the city? A. Yes.")

14

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 18 ("Although the Nation has entered into and successfully implemented cross-deputization agreements with the vast majority of the federal, State, and local law enforcement agencies operating within its Reservation boundaries, the City of Henryetta has declined the Nation's repeated invitations to enter into such an agreement."); *id.* ¶ 23 ("The Nation stands ready to cooperate with the City in entering into a cross-deputization agreement and in establishing any necessary policies and protocols to bring the City into compliance with federal law regarding the policing and prosecution of Tribal citizens and other Indians within the Nation's Reservation.")

## THE NATION'S OFFICE OF THE ATTORNEY GENERAL AND DISTRICT COURT SYSTEM ARE WELL-RESOURCED AND FULLY CAPABLE OF EXERCISING CRIMINAL JURISDICTION OVER INDIANS ON THE RESERVATION.

20. **The Nation has significantly increased the budget for the Nation's Office of the Attorney General and District Court since *McGirt*, with the Nation's own revenues providing the vast majority of funding.**

    EVIDENCE:

    MCN.Ex.48, *MCN Summary: Budgets* (summary exhibit based on MCN.Ex.45, MCN.Ex.46, and MCN.Ex.47, showing, inter alia, that MCN District Court expenditures increased from $1,021,966 in fiscal year 2019 to $6,797,434 as of October 1 in fiscal year 2025; that the Office of the Attorney General expenditures increased from $2,395,072 in fiscal year 2019 to $7,054,890 as of September 30 in fiscal year 2025; and that the vast majority of funding for both institutions is appropriated by the Nation from its own revenues rather than provided by the federal government)

    MCN.Ex.45, *MCN District Court Budget Documents*

    MCN.Ex.46, *MCN A.G. Office Budget Documents*

    Testimony of Secretary of the Nation Zechariah Harjo at 22:5-18 (explaining that "self-governance" funds are a form of federal funding); *id.* at 26:2–27:6 (explaining that MCN.Ex.48 shows, inter alia, the relative contribution of tribal and federal funds to the Nation's District Court and Office of the Attorney General, and that for all years the tribal expenditures far exceeded the federally provided self-governance expenditures)

15

21. **The Nation's prosecutorial capacity has increased significantly since *McGirt*, and the Nation is fully capable of prosecuting cases involving Indians referred to it by state and local police departments.**

EVIDENCE:

Testimony of Deputy Attorney General Geraldine Wisner at 143:6-24, 146:4-16, 148:7-12 (testifying that through the hiring of additional prosecutors and support staff in the wake of *McGirt*, the Nation substantially increased its prosecutorial capacity and has been successful in overcoming an initial backlog of cases, such that the Nation now has sufficient capacity to prosecute all cases within its jurisdiction)

MCN.Ex.15, *MCN AG Office Employment List 2019* (as of fiscal year 2019, the Nation employed one full-time prosecutor)

MCN.Ex.16, *MCN AG Office Employment List 2026* (for fiscal year 2026, the Nation has a budgeted staff that includes thirteen full-time prosecutors, as well as five civil litigators and twenty-two support staff)

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 12 ("Under the cross-deputization agreements, the investigation and prosecution of crimes is generally carried out seamlessly. … Once the investigation is concluded, the officers will submit the report and evidence to the appropriate jurisdiction to prosecute.")

Testimony of Coweta Police Chief Michael Bell at 120:9-23 ("Q. Did you have any -- you had concerns about whether the Nation would end up prosecuting the crimes that you referred. A. No, sir. Q. Why not? A. Well, I actually came down for, I believe it was two different, court cases, and I kind of sat in the courtroom and watched. Their judges are just like our judges. They don't do anything different. They're mainly in there to enforce the law and prosecute crimes. Q. And since then, have you been satisfied with how the Nation has prosecuted individuals you've referred to them? A. Yes, sir.")

22. **The Nation's Office of the Attorney General has highly cooperative relationships with other law enforcement agencies on the Reservation through which jurisdictional issues are successfully addressed.**

EVIDENCE:

Testimony of Deputy Attorney General Geraldine Wisner at 153:24–156:20 (explaining that after resolving jurisdictional disputes via settlement, the City of Tulsa now refers all prosecutions of Indian defendants to the Nation to prosecute; that the Nation has been appropriately prosecuting these cases; that the Nation makes available to Tulsa and the general public information about its prosecutions through its public docketing system; and that Tulsa and the Nation have created a joint law enforcement working group, where representatives from Nation and City leadership,

prosecution offices, and law enforcement meet regularly to discuss and address any issues that may arise in the implementation of their mutual law enforcement and prosecutorial priorities.)

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 14 ("My department has an excellent relationship with the Muscogee (Creek) Nation's Office of the Attorney General. I can pick up the phone at any time and talk to an assistant attorney general to get any question answered.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 4 ("Our partnership with the Lighthorse Police under this cross-deputization agreement has been very successful. The Office of the Attorney General of the Muscogee (Creek) Nation and the Lighthorse Police are top-notch. They have worked hand-in-hand with us to set up a seamless collaboration.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 6 ("Our work with the Nation in investigating cases is also highly effective. If we believe a suspect is a member of a tribe, we send an investigative report to the Nation to confirm that the person is an enrolled member of a tribe. If the Nation determines that it does not have jurisdiction, it sends the case to Wagoner County. This process works seamlessly to get cases into the appropriate court system quickly and has resulted in streamlining and expediting our own case referral and records management processes.")

Testimony of Coweta Police Chief Michael Bell at 120:24–121:13 (explaining that the Muscogee Nation's Attorney General and Chief Prosecutor are committed to public safety, that he has the Nation's Chief Prosecutor on speed dial, and that he feels like he can bring any concern to the Chief Prosecutor's attention and get it rectified quickly)

MCN.Ex.20, *City of Tulsa-MCN Settlement Agreement* (judicial notice of this exhibit taken at Hearing Tr. 154:8-12) (agreement between MCN and City of Tulsa, under which Tulsa refers all tickets and prosecutions of Indian defendants to the Nation, and the Nation and City have established a joint working group to assess and address any issues implicating their mutual law enforcement and prosecutorial priorities)

23. **The Nation has a modernized court system in which defendants' rights are fully protected, and court facilities and technology enable the efficient administration of justice.**

EVIDENCE:

Testimony of Deputy Attorney General Geraldine Wisner at 161:8–162:6 (explaining that the Nation's tribal courts provide criminal defendants with all of the constitutional rights available to criminal defendants in State and federal prosecutions)

Testimony of Court Administrator Kevin Dellinger at 189:20–190:22 (explaining that defendants in MCN District Court are provided with public defenders; that police officers from local departments testify in MCN District Court, and the Nation's new traffic court in Tulsa County will make this more convenient for officers in the northern part of the Reservation; and that MCN traffic tickets may be paid online)

MCN.Ex.6, *Photos of MCN District Court* (depicting MCN District Court building in Okmulgee, hearings inside MCN District Court including an in-custody hearing using videoconferencing technology, and new MCN Traffic Court in Tulsa County)

Testimony of Court Administrator Kevin Dellinger at 188:24–189:14, 190:13-19 (explaining what is shown in the photos in MCN.Ex.6)

MCN.Ex.7, *New MCN Court Building Design*

Testimony of Court Administrator Kevin Dellinger at 191:7–192:11 (explaining that MCN.Ex.7 contains the designs and rendering of new courthouse that the Nation recently began constructing, and that the Nation's investment in this courthouse reflects the Nation's commitment to public safety and criminal justice)

Testimony of Coweta Police Chief Michael Bell at 119:7-14 ("Q. … When your department has referred cases to the Nation attorney general's office, have your police officers then testified in tribal court? A. Yes, they do get subpoenaed just like they could any other court. Q. And that works out fine? A. Yes.")

Testimony of Coweta Police Chief Michael Bell at 120:9-23 (explaining that he watched court cases in Muscogee Nation District Court before entering a cross-deputization agreement and that "[t]heir judges are just like our judges…They're mainly in there to enforce the law[.]")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 13 ("Okmulgee officers have testified in federal court and tribal court about cases involving tribal defendants whom they investigated or arrested. This has worked well. I have not received any complaints from any officers relating to the process of testifying in federal or tribal court.")

24. **The Nation's District Court has substantially increased its staffing since *McGirt* was decided, more than doubling the number of judges and non-judge court personnel.**

<u>EVIDENCE</u>:

MCN.Ex.1, *MCN District Court Employment Data* (memorandum showing increase in MCN District Court employment from three judges and five non-judge personnel in July 2020 to seven judges and thirty-six non-judge personnel in September 2025)

Testimony of Court Administrator Kevin Dellinger at 187:14–188:23 (discussing figures in MCN.Ex.1, which reflect the increase in MCN District Court judges and non-judge personnel since *McGirt* was decided)

25. **The Nation's District Court has increased its capacity substantially since *McGirt* was decided. It now handles more than 1,000 felony charges and more than 2,200 traffic citations annually—a figure that will further increase now that the City of Tulsa and the City of Okmulgee have agreed to refer traffic citations to the Nation.**

EVIDENCE:

MCN.Ex.12, *Summary: MCN Findings on Charges* (summary exhibit with graph and tables compiling data in MCN.Ex.8, MCN.Ex.9, MCN.Ex.10, MCN.Ex.11, showing increases in felony, misdemeanor, traffic, and DWI cases from 2019 to 2025)

MCN.Ex.8, *MCN Felony Findings 2019–2025*

Testimony of Court Administrator Kevin Dellinger at 194:15–195:20 (explaining that MCN.Ex.8 shows 119 dispositions of felony charges in MCN District Court in 2020 and 1,298 in 2024, reflecting a ten-fold increase in the number of felonies prosecuted annually)

MCN.Ex.9, *MCN Misdemeanor Findings 2019–2025*

Testimony of Court Administrator Kevin Dellinger at 195:21–196:11 (explaining that MCN.Ex.9 shows 115 dispositions of misdemeanor charges in MCN District Court in 2020 and 686 in 2024)

MCN.Ex.10, *MCN Traffic Findings 2019–2025*

Testimony of Court Administrator Kevin Dellinger at 197:3-18 (explaining that MCN.Ex.10 shows dispositions of 188 traffic charges in 2020 and 2,281 in 2024, including 1,944 traffic tickets that individuals paid without contesting)

Testimony of Court Administrator Kevin Dellinger at 197:19-23 (explaining that the number of annual traffic citations disposed of in the MCN District Court will increase substantially now that Tulsa and Okmulgee have agreed to refer citations to the Nation)

MCN.Ex.11, *MCN DWI Findings 2019–2025*

Testimony of Court Administrator Kevin Dellinger at 198:7–199:12 (explaining that MCN.Ex.11 shows DWI charges in MCN District Court from 2019 to 2025, including 73 felony DWI charges and 225 misdemeanor DWI charges in 2025, and explaining that as in the Oklahoma state system, a first-time DWI is a misdemeanor)

26. **The Nation's District Court requires pre-trial detention and imposes prison sentences as needed to protect public safety, including for serious traffic offenses.**

    EVIDENCE:

    Testimony of Court Administrator Kevin Dellinger at 201:9–202:25 (explaining that Nation judges require pre-trial detention and impose prison sentences when necessary for public safety; that the Nation spends over $5 million on incarceration each year; and that the Nation generally sends prisoners with sentences exceeding one year to the Federal Bureau of Prisons Tribal Prisoner Program)

    Testimony of Deputy Attorney General Geraldine Wisner at 151:24–152:11 (explaining that the Nation pursues incarceration to address offenders' conduct but will also employ alternatives to incarceration such as mental health or substance abuse treatment where appropriate)

    Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 27 ("The Nation's modern criminal justice system is modeled on and encompasses all the features commonly employed in state and federal justice systems, including incarceration, vehicle impoundment, and/or criminal fines and monetary penalties where appropriate.")

    Testimony of Court Administrator Kevin Dellinger at 201:12-14 ("[W]e have a case recently where an individual defendant received five years to the Bureau of Prisons for multiple DWIs.")

**THE NATION SEEKS TO EXERCISE ITS CRIMINAL JURISDICTION IN A MANNER CONSISTENT WITH THE NATION'S VALUES AND PRIORITIES.**

27. **The Nation's Lighthorse Police Department aims to treat everyone in the community—including victims and suspects—with respect and courtesy.**

    EVIDENCE:

    Testimony of Lighthorse Police Chief Richard Phillips at 53:1-11 ("Q. … [W]hat would you say are the values of your department? A. Our values are a genuine love for our citizens and our community and public safety. Q. How do you want your officers to treat victims, suspects, and other people that they encounter? A. All those that we encounter, we treat them as though they're one of our relatives, somebody's mother, brother, sister, aunt, uncle, whoever. I expect our officers to treat our individuals with a level of courtesy and respect.")

    Testimony of Lighthorse Police Chief Richard Phillips at 85:4–88:3 (explaining that the Henryetta Police Department's treatment of Darious Tiger, as described in Mr. Tiger's declaration (Dkt. 14), was bad for public safety and not consistent with Lighthorse's standard of conduct)

20

Testimony of Lighthorse Police Chief Richard Phillips at 72:20–73:12 (explaining how impounding a car can cause a substantial financial burden for an individual)

Testimony of Lighthorse Police Chief Richard Phillips at 56:11-24 (describing success of Lighthorse's specialized team that works to divert individuals experiencing mental health episodes to medical facilities for treatment instead of to jail)

Henryetta Ex. 5, *Henryetta Body Cam Footage of Stop of Brandon Britt on September 29, 2025*, at 18:18:54–18:19:35 (Lighthorse officer treating suspect respectfully and asking where he lives and how far he would be walking home after his car is impounded)

28. **When a Lighthorse officer acts below standards (including when policing in Henryetta), he is subject to significant discipline.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 88:4-23 (discussing example of Lighthorse officer who showed up to a scene and argued with a Henryetta officer about which of them had jurisdiction instead of promptly attending to the scene, and how this Lighthorse officer was subject to disciplinary action and was eventually terminated)

29. **The Nation's Office of the Attorney General provides professional support to victims and witnesses of crime.**

EVIDENCE:

Testimony of Deputy Attorney General Geraldine Wisner at 148:13–149:14 (describing role of the Office of the Attorney General's victim-witness specialist in supporting witnesses and victims, and role of the Special Assistant United States Attorney in supporting the prosecution of cases involving victims)

Testimony of Deputy Attorney General Geraldine Wisner at 150:9-22 ("Q. So with respect to victims of crime, what are the Nation's goals for addressing the circumstances of those victims? A. For victims of crime, I believe the Muscogee Creek Nation is in a unique position of not only understanding the trauma one must have experienced in order to be that current victim, but there's also the important background of historical and intergenerational trauma that a lot of—unfortunately, a lot of Native families experience. The Nation has invested in significant victim resources and programs to be able to provide healing and to interrupt this intergenerational circle of trauma.")

30. **Lighthorse officers, Nation prosecutors, and Nation judges take financial hardship into account in their treatment of offenders. The Nation does not rely on fines and fees to fund its courts or Office of the Attorney General.**

    EVIDENCE:

    Testimony of Lighthorse Police Chief Richard Phillips at 72:20–73:12 (explaining how impounding a car can cause a substantial financial burden for an individual)

    Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶¶ 27–28 ("The Nation's modern criminal justice system is modeled on and encompasses all the features commonly employed in state and federal justice systems, including incarceration, vehicle impoundment, and/or criminal fines and monetary penalties where appropriate. And while such punitive measures are among the most vital and indispensable of law enforcement tools, the Nation's longstanding policy is to also prioritize rehabilitation, healing, restorative justice, and offender reintegration to the greatest degree consistent with fundamental public safety imperatives. … [T]he Nation approaches each criminal adjudication with paramount regard for the individual dignity and practical well-being of all members of the community, including criminal defendants, and seeks in all cases to minimize the adjudication's potential to negatively impact individual lives and families. In this way, the Nation seeks to best ensure public safety while honoring victims' needs and maximizing the prospects that offenders will respect the law going forward and avoid further harm to the community.")

    Testimony of Court Administrator Kevin Dellinger at 186:13–187:8 (explaining that the Nation does not rely on fines and fees to fund its court system but instead relies on appropriations, and that judges regularly waive fines and fees when they would cause financial hardship for a defendant who is otherwise complying with court-imposed conditions of release)

    Testimony of Court Administrator Kevin Dellinger at 187:9-13 ("Q. And does the Muscogee Nation AG's office fund itself, through fines and fees? A. No. No. Same thing. It never has. That's never been a way to proceed within the office. It's always been funded by tribal appropriation.")

31. **Where consistent with public safety, the Nation seeks to provide offenders with substance abuse treatment and mental health treatment as alternatives to incarceration or as conditions of parole.**

    EVIDENCE:

    Testimony of Deputy Attorney General Geraldine Wisner at 150:23–152:11 (explaining that the Nation pursues incarceration to address offenders' conduct but

employs alternatives to incarceration such as mental health or substance abuse treatment where appropriate)

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 27 ("[W]hile … punitive measures are among the most vital and indispensable of law enforcement tools, the Nation's longstanding policy is to also prioritize rehabilitation, healing, restorative justice, and offender reintegration to the greatest degree consistent with fundamental public safety imperatives. So while the Nation can and does incarcerate offenders when appropriate, our justice system seeks to identify and address the root causes underlying an individual's behavior, in order to prevent recidivism and to set the offender up for the greatest possibility of renewed success as a member of the Reservation community.")

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶¶ 31–33 ("One of the key features of the Nation's criminal justice system is its emphasis on rehabilitation and healing, particularly when an offender's conduct relates to addiction or other mental health needs. Such offenders are often eligible to receive treatment from the Nation's Department of Health, Behavioral Health and Substance Abuse treatment program in lieu of incarceration or other punitive measures. Generally, if eligible offenders can commit to completing appropriate treatment programs, the Nation's prosecutor will request, and the Court will frequently grant, a deferred judgment or suspended sentence regime for the offender. Upon the successful completion of the behavioral health or substance abuse treatment program and any additional conditions imposed by the Court, the offender will be eligible for release, with any records of the case expunged by the Court. *See* MCN Code tit. 14, § 1-609 (Deferred Judgment Procedure). … These procedures differ substantially from the drug court programs available under State law. For an offender to be eligible for drug court under Oklahoma law, the offender must meet an extensive list of qualifying criteria not applicable to offenders under the Nation's jurisdiction. *See* Okla. Stat. tit. 22, § 471.2. … While it is the State's sovereign prerogative to set whatever conditions on its drug court and treatment programs it feels best meet the needs of its community, the Nation enjoys the same sovereign prerogative and has found that the State's conditions do not effectively serve the needs of the Nation or of the Indian persons subject to its jurisdiction. It is the Nation's judgment that focusing on making rehabilitation and remedial services more readily available to all offenders afflicted with substance abuse and mental health issues best comports with the Nation's values and public safety objectives.")

Testimony of Court Administrator Kevin Dellinger at 202:13-22 (explaining that MCN District Court judges use less punitive alternatives to prison when doing so is consistent with public safety, such as ankle monitors, substance abuse treatment, and behavioral health treatment)

23

Testimony of Lighthorse Police Chief Richard Phillips at 56:6-19 (explaining work of Lighthorse's specialized team that helps individuals experiencing mental health issues receive medical attention and mental health treatment instead of incarceration)

32. **Where consistent with public safety, the Nation seeks to support the reintegration of offenders so that they can remain contributing members of the Reservation community.**

EVIDENCE:

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 35 ("The Tribal Code additionally provides the Nation's courts with discretion to craft criminal sentences to satisfy the imperatives of public safety and victim needs while facilitating the rehabilitation and reintegration of offenders where possible. For instance, at the request of the Attorney General or Chief of Lighthorse Police and with the consent of the convicted person, the Court may "arrange for the convicted person to continue his or her regular employment without interruption insofar as is reasonably possible[.]" MCN Code tit. 14, § 1-614. The Nation's courts additionally exercise discretion to impose deferred or suspended sentences where there is no threat to public safety and the offender complies with the conditions of probation or supervised relief; upon the successful completion of those conditions and probationary period, the Court may authorize the defendant to withdraw a guilty plea and expunge any record of the proceedings. *Id.*")

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶¶ 37–38 ("The Nation's commitment to addressing the conditions that lead to recurring criminal behavior is additionally expressed through its robust Adult Offender Reintegration program. … For instance, one seemingly simple, but in practice often significant, barrier to effective reintegration faced by many offenders is the loss of driving privileges, without which the barriers to obtaining employment or accessing services can increase exponentially, particularly for those who reside in more rural and remote areas of the Reservation. Accordingly, the Nation's reintegration program provides a License Reinstatement Program, which assists offenders in paying license reinstatement fees, vehicle interlock (i.e., breathalyzer) device installation fees, and alcohol or substance abuse treatment courses that may be required before an offender is eligible for license reinstatement. Helping those offenders whom the courts have deemed eligible to return to the road, but who face otherwise-insurmountable financial barriers to license reinstatement, provides the mobility options necessary for those individuals to find lawful employment opportunities, access substance abuse treatment and other services, and participate in community and family life. The Nation has found all these factors to be vital components of an offender's recovery and critical to creating the conditions best suited to preventing recidivism.")

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 39 ("Another significant barrier to reintegration is a lack of employment skills and opportunities on the part of offenders, many of whom consequently struggle to meet conditions of release such as securing gainful employment, paying fines and court costs, and supporting themselves and their families lawfully as productive members of society. For these reasons, the reintegration program's Fiber Technician Training Program has proven to be highly successful in helping offenders break the cycle of criminal conduct and incarceration and to find stable and high-paying employment both within the Reservation and across the United States. ... The program is open to any interested individuals regardless of tribal membership status or criminal history, and as part of the Nation's focus on making effective reintegration services available to all offenders within the Nation's jurisdiction, the Nation provides funding assistance for offenders who would otherwise be unable to access the training program.")

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 40 ("In sum, the Nation, including its law enforcement officers, prosecutors, judges, and other criminal justice professionals, strive to reduce crime and protect all community members not only through punitive measures but by eliminating the conditions leading to criminal behavior and providing support programs, alternatives to prosecution and incarceration, and reintegration services for offenders, which measures are proving successful in enhancing public safety and honoring the potential of Nation citizens. When a non-Nation jurisdiction prosecutes and punishes a Nation citizen or other Indian for conduct within the Creek Reservation, that thwarts the Nation's opportunity to implement the foregoing array of criminal justice policies and programs that the Nation has established in the exercise of its own sovereignty and self-government.")

## THE NATION AND HENRYETTA CAN PROTECT PUBLIC SAFETY WITHOUT HENRYETTA UNILATERALLY ASSERTING CRIMINAL JURISDICTION OVER INDIANS.

33. **The Nation incorporates state and local criminal law into the Nation's criminal code, such that in Henryetta substantially the same criminal laws apply to Indians as apply to non-Indians.**

EVIDENCE:

Testimony of Deputy Attorney General Geraldine Wisner at 159:10–160:23 (explaining that the Nation has adopted its own comprehensive traffic code that incorporates substantially the same traffic laws in effect throughout the State of Oklahoma, and additionally has adopted a Supplemental Crimes Act that incorporates Oklahoma's criminal laws with respect to offenses that are not otherwise covered by the Nation's existing criminal laws)

25

Tribal Code of the Muscogee (Creek) Nation tit. 14, ch. 2, subch. 1, §2-114, Supplemental Crimes Act, https://law.muscogeenation.com/mvskokelaw/title-14/title-14-chapter-2-criminal-offenses

Tribal Code of the Muscogee (Creek) Nation tit. 14, ch. 3, Muscogee (Creek) Nation Traffic Code, https://law.muscogeenation.com/mvskokelaw/title-14/title-14-chapter-3-muscogee-creek-nation-traffic-code

**34. The Henryetta Police Department and the Nation are capable of protecting public safety in Henryetta without Henryetta unilaterally exercising criminal jurisdiction over Indians. Lighthorse officers regularly pass through Henryetta or patrol in the area. For an emergency call from Henryetta, Lighthorse officers arrive in fifteen minutes or less.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 69:10-19, 70:13-18 (explaining that if a local officer who is not cross-commissioned by Lighthorse pulls over an Indian, the officer cannot arrest or issue a citation for the Indian but can contact Lighthorse to come to the scene to handle the stop)[2]

Declaration of Muscogee (Creek) Nation Lighthorse Police Chief Richard Phillips (Dkt. 50) ¶ 4 ("The Lighthorse Police Department's main headquarters are located in Okmulgee, Oklahoma, just fifteen miles from the City of Henryetta. Lighthorse police officers regularly patrol routes in and around Henryetta.")

Testimony of Lighthorse Police Chief Richard Phillips at 96:21–100:5 (discussing a recent stop he made in Henryetta and explaining that he and his officers regularly pass through Henryetta and sometimes patrol Henryetta's streets, albeit not on a regularly scheduled basis)

---

[2] The Tenth Circuit has already held that this jurisdictional arrangement, in which state and local police officers' power to enforce the law against Indians in Indian Country is constrained under long-standing Indian law jurisprudence, is consistent with public safety. *See Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1007 (10th Cir. 2015) ("[N]othing in the requested temporary injunction would prevent the State and County from patrolling roads like the ones on which Ms. Jenkins was stopped, from stopping motorists suspected of traffic offenses to verify their tribal membership status, from ticketing and prosecuting non-Indians for offenses committed on those roads, from referring suspected offenses by Indians to tribal law enforcement, or from adjudicating disputes over the Indian status of accused traffic offenders when meaningful reasons exist to question that status.").

Declaration of Muscogee (Creek) Nation Lighthorse Police Chief Richard Phillips (Dkt. 50) ¶ 4 ("Depending on the proximity of the nearest Lighthorse patrol vehicle when a call for service is received, I would estimate that Lighthorse's average response time for a non-emergency service call originating within Henryetta city limits is approximately 15 to 20 minutes. In the case of an emergency, Lighthorse's anticipated response time would be approximately 10 to 15 minutes. Of course, if a Lighthorse police officer is patrolling in the City when a service call comes in, the response time would be lower still.")

Testimony of Lighthorse Police Chief Richard Phillips at 73:23–75:24 (explaining that if the nearest officer is at Lighthorse headquarters in Okmulgee, it will take approximately fifteen minutes to get to a scene in Henryetta; that the response time will be shorter if there is an officer closer to Henryetta; and that he has responded to a scene within three minutes)

MCN.Ex.68, *CFS Detail Report (May 30, 2025)*, at 001 (emergency call in which Lighthorse dispatch received a call at 10:31 a.m. and officers were on the scene eleven minutes later)

Testimony of Coweta Police Chief Michael Bell at 122:2-4 (testifying that Lighthorse has never refused to respond to an emergency in Coweta on account of being too busy)

**35. Henryetta has shown itself to be capable of calling on Lighthorse to respond to calls involving Indian suspects, and in doing so the Henryetta and Lighthorse officers have generally developed positive relationships.**

EVIDENCE:

MCN.Ex.67, *CFS Detail Report (June 26, 2024)*, at 001 (Lighthorse dispatch log, stating "HENRYETTA PD ADVISED THAT VICTOR GUZMAN (CHOCTAW CITIZEN) IS AT ABOVE LOCATION, SCREAMING AND YELLING … BLACK HOODIE, BLUE SHORTS AND NO SHOES, REQ. LH")

Testimony of Henryetta Police Chief Steve Norman at 214:5-22 ("Q. … In your position as chief of police, what's your observation with respect to the relationship between Lighthorse and Henryetta Police Officers? A. I would say generally it's pretty good. I mean, at an officer's level, these guys work together a lot, so they see each other a lot. They may have even worked together at some point from some other department. But I don't see either department as being adversarial to the other. Q. Do you know Chief Phillips? A. Yes. Q. And how's your relationship with Chief Phillips? A. Chief Phillips is a good man. Does a good job up there, and I've talked to him on several occasions. May not always agree on a couple of things administratively, but, generally, I respect him, yes.")

27

36. **To the extent Henryetta has concerns about Lighthorse's response times or manpower in Henryetta, it could resolve those concerns by accepting the Nation's offer to enter a cross-deputization agreement.**

EVIDENCE:

Testimony of Henryetta Police Chief Steve Norman at 234:10-12 (agreeing that a Henryetta officer who effected the stop of a Creek citizen and waited an hour for Lighthorse to arrive "could have handled the traffic stop himself" if there were a cross-deputization agreement between Henryetta and the Nation)

Testimony of Deputy Attorney General Geraldine Wisner at 160:24–161:7 ("Q. If Henryetta had any concerns regarding the ability of Lighthorse to fully patrol the city and respond to all crimes committed by member and non-member Indians, could those concerns be addressed by entering into a cross-deputization agreement? A. They definitely would. Q. And the Nation would be willing to enter into one with the city? A. Yes.")

Declaration of Okmulgee Police Chief Danny Owen (Dkt. 52) ¶ 5 ("Using our cross-deputization agreement with the Muscogee (Creek) Nation is in the best interest of public safety and the citizens we serve. It is a force-multiplier that significantly improves the number of officers and the equipment available for law enforcement in Okmulgee, and allows us to serve the community in a more efficient and effective manner.")

Declaration of Coweta Police Chief Michael Bell (Dkt. 51) ¶ 11 ("The responsiveness and capacity of law enforcement in Coweta is stronger than it has ever been. Entering a cross-deputization agreement with the Nation was like doubling my police force without having to pay for it. Our partnership with Lighthorse under the cross-deputization agreement has brought tremendous benefits to the City of Coweta and my department, and I am grateful for that partnership in enforcing the laws and protecting all citizens within the City.")

*See supra* MCN Proposed Findings of Fact 14–18 (citing additional evidence and testimony establishing that cross-deputization agreements promote public safety)

*See supra* MCN Proposed Finding of Fact 19 (citing additional evidence and testimony establishing that the Nation would readily enter a cross-deputization agreement with Henryetta on the same terms as it has with the other sixty-four law enforcement agencies with whom it has cross-deputization agreements)

**HENRYETTA'S ASSERTION OF CRIMINAL JURISDICTION OVER INDIANS HAS NOT SERVED THE INTEREST OF PUBLIC SAFETY.**

37. **After *McGirt*, Henryetta has continued to issue citations and prosecute both MCN citizens and non-member Indians within the Reservation.**

EVIDENCE:

Testimony of City Attorney John Insabella at 208:18–210:3 (explaining that he continued to prosecute all cases against MCN citizens and non-member Indians following the *McGirt* decision; "After *McGirt*, I believe I had a gentleman say he was tribal, and I think … I said, well, *McGirt* doesn't matter for this charge.")

*See infra* MCN Proposed Finding of Fact 38 (citing evidence and testimony regarding Henryetta's citations, arrests, and prosecutions of MCN citizens in 2024 and 2025)

38. **For traffic violations and other municipal violations for which Henryetta can obtain revenue, certain Henryetta officers have aggressively policed Indians and Henryetta has prosecuted Indians with little regard for their wellbeing or financial situation.**

EVIDENCE:

MCN.Ex.66, *Complaint Card (Feb. 19, 2024)*, at 001 (Lighthorse report of incident in which MCN citizen reported having been pulled over by the Henryetta Police Department and being given a ticket despite requesting Lighthorse)

MCN.Ex.69, *CFS Detail Report (July 23, 2025)*, at 001 (Lighthorse dispatch log in which an individual contacted Lighthorse "IN REGARDS TO HENRYETTA PD HARRASSING HIM, ADVISED WAS PULLED OVER AND DETAINED")

Declaration of Darious Tiger (Dkt. 14) ¶¶ 1–5 (describing incident in which a Henryetta officer pulled him over around 12:42 a.m. on December 4, 2024, ignored his statement that he was a MCN citizen and declined to see his tribal enrollment card, issued him tickets for driving with expired tags and driving without insurance, impounded his car, and left him at the side of the road to walk home alone after midnight and in cold weather without appropriate clothing and without offering a ride or arranging for other transport; explaining that the Henryetta Municipal Court Judge told him that his tribal citizenship did not matter to Henryetta's jurisdiction over him and that he ultimately had to pay $819 in tickets and approximately $400 to retrieve his impounded car); *see also* Dkts. 14-1–14-3 (traffic citations and payment plan)

Declaration of Daniel L. Bear (Dkt. 13) ¶¶ 1–6 (describing May 11, 2025 incident in which a Henryetta officer pulled him and his wife over for driving with one tag light out, told him "that's not how it works" when he informed the officer of his MCN citizenship, required him to get out of the vehicle after learning he lacked a valid

29

driver's license, pushed him up against the vehicle and handcuffed him, ignored his wife's effort to provide proof of insurance, took him to Henryetta jail where his wife had to pay cash bond to bail him out, and gave him tickets for driving under suspension and driving without insurance); *see also* Dkts. 13-1–13-5 (tickets, O.R. Release form, bond receipt, and contact report)

Incident/Offense Report (Dkt. 41-9) at 8 (Henryetta officer's incident report providing narrative of the arrest of Daniel Bear generally consistent with the details provided by Mr. Bear in his declaration (Dkt. 14))

Declaration of Heather Rodgers (Dkt. 16) ¶¶ 1–7 (describing February 10, 2025 incident in which a Henryetta officer pulled her over, rejected her request for a Lighthorse officer upon her showing her MCN tribal enrollment card, informed her that she had a five-year-old outstanding warrant that she was not aware of, issued her a ticket for driving with an expired license, handcuffed her and impounded her car, and brought her to jail where her daughter had to bail her out by paying $100 of a $1,146 bond; stating that she could not retrieve her vehicle for weeks due to the city and impoundment facility being non-responsive and that she ultimately had to pay $830 in fines and fees to secure its release more than a month after the incident; explaining that the loss of her vehicle interfered with her ongoing treatment for pancreatic and colon cancer); *see also* Dkts. 16-1–16-3 (ticket, bond receipt, and O.R. Release Form)

Incident/Offense Report (Dkt. 41-3) at 7 (Henryetta officer's incident report providing narrative of the arrest of Heather Rodgers that does not contradict the details provided by Ms. Rodgers in her declaration (Dkt. 16))

**39. Where Henryetta clearly *does* have jurisdiction over incidents involving Indians—such as situations in which Indians need emergency medical assistance or are victims of crimes by non-Indians—Henryetta has refused to help MCN citizens and non-member Indians who call for help. Even during the pendency of this case, the Henryetta Police Department has refused to come to the aid of Indians.**

EVIDENCE:

Testimony of Lighthorse Police Chief Richard Phillips at 70:19–71:13 (testifying that the Henryetta Police Department has jurisdiction to respond to emergency calls from Indians and to handle crimes with Indian victims, and that Lighthorse responds to emergency calls regardless of whether the person in need is Indian or non-Indian)

Testimony of Lighthorse Police Chief Richard Phillips at 76:2–78:5 (explaining MCN.Ex.64, a Lighthorse police report for an incident in which a non-member Indian reported that his laundromat had been vandalized, there was no basis to believe that the suspect was Indian, and yet the Henryetta Police Department directed the victim to

Lighthorse instead of investigating the crime itself; stating that the vandal was eventually caught and turned out to be a non-Indian)

MCN.Ex.64, *Complaint Card (Oct. 23, 2023)*, at 001 ("RP ADVISED HE HAD A BREAK IN AT 4:36 THIS MORNING. HE CALLED HENRYETTA PD AND THEY TOLD HIM TO CALL LH BECAUSE HE IS NATIVE. …"), 004 (describing camera footage of crime and the appearance and attire worn by the vandal)

Testimony of Lighthorse Police Chief Richard Phillips at 78:12–79:5 (explaining MCN.Ex.65, a Lighthorse police report for an incident in which a Cherokee citizen reported that a non-Indian had stolen his pistol and that the Henryetta police department had refused to take up the matter because he—the victim—was an Indian)

MCN.Ex.65, *Complaint Card (Feb. 7, 2024)*, at 001 ("RP ADVISED HE IS A TRIBAL WITH CHEROKEE AND A NON NATIVE MALE (RYAN HINLEY) STOLE HIS PISTOL – ADVISED HE WENT TO HENRYETTA PD TO FILE A REPORT AND THEY TURNED HIM AEWAY [sic] BECUASE [sic] HE IS NATIVE[.]")

Testimony of Lighthorse Police Chief Richard Phillips at 79:13–81:7 (explaining MCN.Ex.68, a Lighthorse dispatch log for an incident in which the Henryetta Police Department "blind transferred" to Lighthorse a call for emergency medical help from a MCN citizen, whom Lighthorse reached within eleven minutes and who required emergency medical services)

MCN.Ex.68, *CFS Detail Report (May 30, 2025)*, at 001 (Lighthorse dispatch log showing blind transfer from Henryetta Police Department, Lighthorse arriving on scene within eleven minutes, and emergency medical services being required)

Testimony of Lighthorse Police Chief Richard Phillips at 81:8–82:9 (explaining MCN.Ex.70, a Lighthorse dispatch log for an incident in which a MCN citizen called the Henryetta Police Department because two stray pitbulls were in her yard, but the Henryetta Police Department refused to send its animal control because she was an Indian)

MCN.Ex.70, *CFS Detail Report (Sept. 19, 2025)*, at 001 ("W-42 advised while on 21 with the RP, she stated that she attempted to contact Henryetta PD in regards to the animals and they refused to send their animal control due to the RP being Native.")

Testimony of Coweta Police Chief Michael Bell at 112:18–113:8 (explaining that even without a cross-deputization agreement, his police department would respond to emergency calls from Native victims because it is "the right thing to do" and "if you have a crime scene, you need to get there and secure that crime scene" to protect the victim and preserve evidence)

40. **Henryetta's decision to police and prosecute Indians while refusing to enter a standard cross-deputization agreement is motivated in substantial part by a desire to collect revenue.**

   EVIDENCE:

   Hearing Transcript at 279:19–280:23 ("THE COURT: But wouldn't cross-deputization, wouldn't that answer the city of Henryetta's public safety concern? MR. NOWLIN: No. THE COURT: How would it not? MR. NOWLIN: How would it not? Well, cross-deputization, I'm not going to suggest it's a bad thing. Would it answer all of the concerns of the city? Not necessarily. Because, again, what happens with the revenues that come from the cross-deputization agreement or from citations or from prosecutions? Is the city going to be doing work for which it is not compensated anything? … THE COURT: Mr. Nowlin, I debated whether I was going to bring it up today, but it is the elephant in the room, I think. MR. NOWLIN: Okay. THE COURT: Is that the bottom line for the city of Henryetta? They're losing revenue because they're sending traffic to the Creek Nation, and that's the only reason they don't want to do it? MR. NOWLIN: It's an elephant in the room. That's not the only reason, but that is a concern. Honestly, that is a concern.")

41. **In the absence of a court order, nothing will prevent Henryetta from continuing to arrest, ticket, and prosecute both MCN citizens and non-member Indians.**

   EVIDENCE:

   Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 1 (Joint Stipulation in which Henryetta agreed "not to prosecute in its municipal courts enrolled members of the Muscogee (Creek) Nation for criminal offenses" or "refer enrolled members of the Muscogee (Creek) Nation to the District Attorney for Oklahoma's 25th Prosecutorial District for prosecution in the District Court of Okmulgee County," but only during "*such time as the Nation's Motion for Preliminary Injunction, Dkt. 11, remains pending, or upon further order of the Court*" and without any restriction on policing activity (emphasis added))

   Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 2 (Joint Stipulation in which Henryetta agreed to dismiss tickets or citations "in the event that Henryetta Police Department officers issue tickets or citations to enrolled members of the Muscogee (Creek) Nation," but only during "*such time as the Nation's Motion for Preliminary Injunction, Dkt. 11, remains pending, or upon further order of the Court*" and without any restriction on such policing activity (emphasis added))

   Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 3 (Joint Stipulation in which Henryetta agreed "not to prosecute in its municipal courts enrolled members of federally recognized tribes who are not members of the Muscogee (Creek) Nation for criminal offenses" or "refer such non-members to the

District Attorney for Oklahoma's 25th Prosecutorial District for prosecution in the District Court of Okmulgee County," but only during "*the time up to and including October 7, 2025*" and without any restriction on policing activity (emphasis added))

Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 4 (Joint Stipulation in which Henryetta agreed to dismiss tickets or citations "in the event that Henryetta Police Department officers issue tickets or citations to a non-member of the Muscogee (Creek) Nation who is a member of another federally recognized tribe," but only during "*such time up to and including October 7, 2025*" and without any restriction on such policing activity (emphasis added))

## HENRYETTA'S ASSERTION OF CRIMINAL JURISDICTION OVER INDIANS INTERFERES WITH THE NATION'S SOVEREIGNTY IN SIGNIFICANT PRACTICAL WAYS.

42. **As recognized by Congress when adopting its *Duro* fix legislation, the exercise of authority over non-member Indians implicates tribal sovereignty because non-member Indians are deeply intertwined in reservation Indian communities, including that of the Nation. Many non-member Indians reside on and own property on the reservation, are intermarried with and raise children with MCN citizens, work for the Nation, receive services from the Nation, and/or come from tribes with a history and land base intertwined with the Nation's.**

EVIDENCE:

H.R. Rep. No. 101-938, 1990 WL 201576 (1990) (Conf. Rep.) (excerpted in MCN.Ex.49, which the Court took judicial notice of at Hearing Tr. 30:2-3) ("This recognition is supported by Federal policy and practice which in many instances, established Indian reservations on which several tribes were to be settled under the governance of a single tribal government. Throughout the history of this country, the Congress has never questioned the power of tribal courts to exercise misdemeanor jurisdiction over non-tribal member Indians in the same manner that such courts exercise misdemeanor jurisdiction over tribal members. Instead the Congress has recognized that tribal governments afford a broad array of rights and privileges to non-tribal members. Non-tribal member Indians own property on Indian reservations, their children attend tribal schools, their families receive health care from tribal hospitals and clinics. Federally-administered programs and services are provided to Indian people because of their status as Indians, without regard to whether their tribal membership is the same as their reservation residence. The issue of who is an Indian for purposes of Federal law is well-settled as a function of two hundred years of Constitutional and case law and Federal statutes.")

S. Rep. No. 102-153, at 5–6 (1991) (excerpted in MCN.Ex.49, which the Court took judicial notice of at Hearing Tr. 30:2-3) ("The action of the Congress reaffirming the

inherent authority of tribal governments to exercise criminal jurisdiction over all Indians on their reservations is premised upon the reality and practice of reservation life: that non-tribal member Indians own homes and property on reservations, are part of the labor force on the reservation, and frequently are married to tribal members. Non-tribal member Indians receive the benefits of programs and services provided by the tribal government. Their children attend tribal schools, and their families receive health care services in tribal hospitals and clinics. Most Indian reservations are located far from urban centers, they are geographically isolated and remote, they are separated from state law enforcement centers by significant distances. The only practical means of providing an immediate law enforcement response to situations arising on the reservation has consistently been found to be that of tribal or local BIA police, with arraignment in tribal court, and confinement in tribal detention facilities. In addition, over the course of many years, Federal policy forced the relocation of many tribes onto one reservation[.]")

Testimony of Secretary of the Nation Zechariah Harjo at 31:16–32:10 (testifying that non-member Indians live within, own property, and are married to and raise children in common with MCN citizens on the Reservation)

Testimony of Secretary of the Nation Zechariah Harjo at 44:22–46:10 (explaining that the Nation provides employment, jobs training, educational benefits, healthcare, and social services and low income support programs to non-member Indians because they are part of the Reservation community, and the Nation has found that providing resources and support to uplift these individuals yields positive results for the Reservation community)

MCN.Ex.56, *MCN TERO*, at 001 (Comprehensive Tribal Employment Rights Ordinance passed by the Nation to "eliminate barriers to employment faced by Muscogee (Creek) Nation citizens and enrolled members of other federally recognized Tribes," including by requiring covered employers to provide hiring preferences for MCN citizens and non-member Indians)

Testimony of Lighthorse Police Chief Richard Phillips at 50:1-17 (explaining that out of 159 Lighthorse employees, 39 are MCN citizens and 30 are members of other federally recognized tribes)

MCN.Ex.57, *Johnson O'Malley Data* (of the 22,605 Natives within the Reservation receiving tribal subsidies for their public schooling, 14,524 are non-members)

MCN.Ex.58, *MCN Tribal Employment & Services Data*, at 001 (MCN (including through its governmental, business enterprise, and health services) employs 2,010 Nation citizens and 965 non-member Indians)

MCN.Ex.58, *MCN Tribal Employment & Services Data*, at 002–004 (data relating to expenditures and recipients of tribal healthcare, education, and social service programs available to Nation citizens and non-member Indians)

34

MCN.Ex.59, *MCN Program Website* (program descriptions for tribal social service programs available to Nation citizens and non-member Indians)

43. **Henryetta's assertion of criminal jurisdiction over MCN citizens and other Indians interferes with the Nation's sovereignty in significant practical ways. It results in unnecessarily aggressive policing that is inconsistent with Lighthorse's approach to law enforcement; usurps the Nation's decision-making regarding the appropriate punishments to seek and administer; and denies the Nation the opportunity to provide services to victims and defendants.**

EVIDENCE:

Testimony of Deputy Attorney General Geraldine Wisner at 149:15–150:4, 163:9–165:17 (explaining that Henryetta's ticketing and prosecution of Indians subject to the Nation's jurisdiction significantly impairs the Nation's ability to exercise its own sovereign prerogatives with respect to the resolution of those individuals' cases; subjects those individuals to duplicative fines and fees; impairs the Nation's ability to provide alternative treatments to those individuals such as mental health and substance abuse treatment; and prevents the Nation from being able to offer services to victims)

Declaration of Deputy Attorney General Geraldine Wisner (Dkt. 12) ¶ 26 ("A key component of the Nation's commitment to public safety is the Nation's implementation of its law enforcement and criminal justice priorities in a manner that is best suited to upholding its values and expectations regarding justice, fairness, and individual accountability, with an emphasis on caring for all of its citizens' safety needs by minimizing those conditions that lead to harmful or criminal conduct. As with other sovereigns, the Nation's community values regarding justice and public safety are reflected in its Law and Order Code; its enforcement of this code through its Lighthorse Police Department, Prosecutor's Office, courts, and other criminal justice professionals; and services provided to victims and offenders aimed at providing critical protection and support for victims while mitigating the conditions that contribute to criminal behavior.")

*Compare* MCN Proposed Finding of Fact 27 (citing evidence and testimony regarding Lighthorse's treatment of suspects), *with* MCN Proposed Finding of Fact 38 (citing evidence and testimony regarding Henryetta's treatment of Indian suspects)

*Compare* MCN Proposed Finding of Fact 38 (citing evidence and testimony regarding severe fines imposed as a result of traffic stops conducted by Henryetta police), *with* MCN Proposed Finding of Fact 30 (citing testimony regarding the Nation's consideration of financial hardship in how its police officers, prosecutors, and courts deal with offenders)

*See supra* MCN Proposed Findings of Fact 29, 31–32 (citing testimony regarding the services the Nation provides to victims and offenders)

<u>**PROPOSED CONCLUSIONS OF LAW - ANNOTATED**</u>

**STANDING AND MOOTNESS**

1. **The Muscogee (Creek) Nation ("Nation" or "MCN") has standing to bring this action because the City of Henryetta's assertion of criminal jurisdiction over Indians within the Nation's Reservation constitutes a concrete injury to the Nation's sovereignty that is fairly traceable to Henryetta's actions and would be redressed by a favorable decision of this Court.**

*Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020) ("[S]tanding requires … (1) … an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." (quotation marks omitted))

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) ("[T]he harm to tribal sovereignty in this case [involving prosecution of an Indian for a traffic offense occurring on a reservation] is perhaps as serious as any to come our way in a long time.")

*Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006) ("[A]n invasion of tribal sovereignty can constitute irreparable injury.")

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1242 (10th Cir. 2001) (describing "interference with or infringement on tribal self-government" as "an obvious harm to the tribe")

*United States v. Lara*, 541 U.S. 193, 199, 210 (2004) (holding that in adopting 25 U.S.C. § 1301(2) (the "*Duro* Fix" legislation), Congress recognized and affirmed that tribes' inherent sovereign power includes the power to exercise criminal jurisdiction over all Indians including non-member Indians)

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 9–10 ("Interference with tribal self-government is a recognized injury supporting Article III standing. *Prairie Band of Potawatomi Indians*, at 1242 (10th Cir. 2001); *Wyandotte Nation*, at 1255 (10th Cir. 2006) ('an invasion of tribal sovereignty can constitute irreparable injury'); *Ute* at 1005. And as the Supreme Court explained in *United States v. Lara*, 541 U.S. 193, 199 (2004), Congress has recognized and affirmed the Nation's inherent power to exercise criminal authority over non-member Indians, further underscoring the sovereign interests at stake.")

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 9 ("A favorable judgment would redress the Nation's injury by preventing the City from exercising criminal authority that federal law does not permit, thereby removing the ongoing interference with the Nation's powers of self-government.")

*Supra* MCN Proposed Findings of Fact 37–38 (citing evidence and testimony regarding Henryetta's citations, arrests, and prosecutions of Indians)

*Supra* MCN Proposed Findings of Fact 27–32, 42–43 (citing evidence and testimony regarding the Nation's administration of its criminal justice system as an incident of its sovereignty and the values reflected therein, and how Henryetta's unilateral assertion of police and prosecutorial power over Indians interferes in significant practical ways with that exercise of sovereignty)

**2. The Nation's claims are not moot because absent a court order, nothing will prevent Henryetta from continuing to arrest, ticket, and prosecute both MCN citizens and non-member Indians. Henryetta stipulated to stop prosecuting MCN citizens only until the Nation's preliminary injunction motion is decided or upon further order from this Court, and to stop prosecuting non-member Indians only through October 7, 2025. Moreover, it has not agreed to any limitations on its policing of either MCN citizens or non-member Indians.**

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("'[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.' *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).")

Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 1 (Joint Stipulation in which Henryetta agreed "not to prosecute in its municipal courts enrolled members of the Muscogee (Creek) Nation for criminal offenses" or "refer enrolled members of the Muscogee (Creek) Nation to the District Attorney for Oklahoma's 25th Prosecutorial District for prosecution in the District Court of Okmulgee County," but only during "*such time as the Nation's Motion for Preliminary Injunction, Dkt. 11, remains pending, or upon further order of the Court*" and without any restriction on policing activity (emphasis added))

Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 2 (Joint Stipulation in which Henryetta agreed to dismiss tickets or citations "in the event that Henryetta Police Department officers issue tickets or citations to enrolled members of the Muscogee (Creek) Nation," but only during "*such time as the Nation's Motion for Preliminary Injunction, Dkt. 11, remains pending, or upon further order of the Court*" and without any restriction on such policing activity (emphasis added))

Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 3 (Joint Stipulation in which Henryetta agreed "not to prosecute in its municipal courts enrolled members of federally recognized tribes who are not members of the Muscogee (Creek) Nation for criminal offenses" or "refer such non-members to the District Attorney for Oklahoma's 25th Prosecutorial District for prosecution in the

District Court of Okmulgee County," but only during "*the time up to and including October 7, 2025*" and without any restriction on policing activity (emphasis added))

Stipulated Motion To Reset Preliminary Injunction Hearing (Dkt. 65) ¶ 4 (Joint Stipulation in which Henryetta agreed to dismiss tickets or citations "in the event that Henryetta Police Department officers issue tickets or citations to a non-member of the Muscogee (Creek) Nation who is a member of another federally recognized tribe," but only during "*such time up to and including October 7, 2025*" and without any restriction on such policing activity (emphasis added))

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 10 ("The City's temporary 'pause' in prosecutions does not moot this case. Voluntary cessation moots only when it is 'absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.' *Already, LLC, v. Nike, Inc.*, 568 U.S. 85, 91 (2013). The City's declaration that it 'intends to continue' such prosecutions forecloses mootness.")

## PRINCIPLES REGARDING GOVERNING LAW

**3.  The precedents of the United States Supreme Court and the Tenth Circuit remain binding unless expressly overruled.**

*Mallory v. Norfolk Southern Railway Co.*, 600 U.S. 122, 136 (2023) (stating that lower court "clearly erred" in holding that a Supreme Court decision "implicitly overruled" prior precedent, and explaining that lower courts may not so hold "even if the lower court thinks the [prior] precedent is in tension with" later precedent (quotation marks omitted))

*Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." (quoting *Hohn v. United States*, 524 U.S. 236, 252–53 (1998)))

*Federal Trade Commission v. Elite IT Partners, Inc.*, 91 F.4th 1042, 1051 (10th Cir. 2024) ("Our precedents remain good law unless the Supreme Court has indisputably and pellucidly abrogated them." (quotation marks omitted)), *cert. denied*, 145 S. Ct. 150 (2024)

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 6 ("The City's theory of 'implicit overruling' contradicts settled law: only the Supreme Court may overrule its own precedents.")

**4. The Court owes no deference to State courts on issues of federal law.**

*Dutcher v. Matheson*, 840 F.3d 1183, 1195 (10th Cir. 2016) ("[I]t is beyond cavil that we are not bound by a state court interpretation of federal law." (quoting *Wilder v. Turner*, 490 F.3d 810, 814 (10th Cir. 2007)))

*Hewitt v. Parker*, No. 08-CV-227, 2012 WL 380335, at *4 (N.D. Okla. Feb. 6, 2012) (stating that federal district courts "owe no deference to the OCCA's adjudication of" federal law issues)

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 6–7 ("State courts do not speak the final word on questions of federal law, and this Court owes no deference, neither doctrinal nor diplomatic, to an opinion that contradicts controlling precedent.")

## STANDARD FOR GRANTING RELIEF

**5. The Nation is entitled to a preliminary injunction because it has established that it is likely to succeed on the merits of its claim, that it will suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that issuance of an injunction is in the public interest.**

*Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) ("'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). An injunction can issue only if each factor is established.")

*Infra* MCN Proposed Conclusions of Law 6–12 (establishing likelihood of success on the merits)

*Infra* MCN Proposed Conclusion of Law 13 (establishing irreparable harm)

*Infra* MCN Proposed Conclusions of Law 14–15 (establishing that the balance of harms and public interest both favor an injunction)

## LIKELIHOOD OF SUCCESS ON THE MERITS

**6.  The United States Supreme Court's decision in *McGirt* recognizes that the Nation's Reservation has never been disestablished and accordingly remains Indian Country today.**

*McGirt v. Oklahoma*, 591 U.S. 894, 937 (2020) ("The federal government promised the Creek a reservation in perpetuity…. Congress has never withdrawn the promised reservation.")

Treaty with the Creeks art. III, June 14, 1866, 14 Stat. 785 (establishing present-day boundaries of the Reservation)

Treaty with the Creeks art. XIV, Mar. 24, 1832, 7 Stat. 366 (guaranteeing to the Nation lands west of the Mississippi, over which they were promised the right of self-government)

Treaty with the Creeks art. II, Feb. 14, 1833, 7 Stat. 417 (establishing original boundaries of the Nation's Reservation)

18 U.S.C. § 1151 ("[T]he term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation[.]")

**7.  The Nation's Reservation remains Indian country for all purposes, not just for purposes of the Major Crimes Act.**

*McGirt v. Oklahoma*, 591 U.S. 894, 899–900, 902 (2020) (analyzing treaties that pre-dated the Major Crimes Act by decades and concluding that "Congress established a reservation for the Creeks" within which, "with exceptions, the Creeks were to be secured in the unrestricted right of self-government" (quotation marks omitted)); *id.* at 903–924 (engaging in extensive analysis of whether Congress has ever disestablished the Reservation and concluding that "in all this history there simply arrived no moment when any Act of Congress dissolved the Creek Tribe or disestablished its reservation," without any aspect of this conclusion turning on the Major Crimes Act); *id.* at 909 (stating that later acts of Congress "left the Tribe with significant sovereign functions over the lands in question," including "the power to collect taxes, operate schools, [and] legislate through tribal ordinances"); *id.* at 912 (discussing Nation's present-day "criminal and civil jurisdiction" within the Creek Reservation)

*McGirt v. Oklahoma*, 591 U.S. 894, 971–972 (2020) (Roberts, C.J., dissenting) (observing that with the Court's decision "state and tribal authority are … transformed" and that many "federal laws, triggering a variety of rules, spring into effect when land is declared a reservation")

41

*Bucklew v. Precythe*, 587 U.S. 119, 136 (2019) ("[J]ust as binding as this [Court's] holding is the reasoning underlying it.")

*Oklahoma v. Castro-Huerta*, 597 U.S. 629, 634, 636 (2022) ("In light of *McGirt* and the follow-on cases [concerning other reservations], the eastern part of Oklahoma, including Tulsa, is now recognized as Indian country," such that the "jurisdictional dispute in this case—which did not concern the Major Crimes Act—"arises … [in] Indian country" as that term is defined in "18 U.S.C. § 1151")

*United States v. Wheeler*, 435 U.S. 313, 325 n.22 (1978) (describing Major Crimes Act as a "carefully limited *intrusion* of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land," not as a *grant* of tribal sovereignty (emphasis added) (citation omitted))

## 8. Under Supreme Court and Tenth Circuit precedent, the State of Oklahoma and its political subdivisions, including the City of Henryetta, lack jurisdiction to prosecute Indians for conduct within Indian country.

*McGirt v. Oklahoma*, 591 U.S. 894, 928–29 (2020) ("[T]his Court has long 'require[d] a clear expression of the intention of Congress' before the state or federal government may try Indians for conduct on their lands." (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572 (1883)) (brackets in original))

*McGirt v. Oklahoma*, 591 U.S. 894, 932 (2020) ("Nor has Congress ever passed a law conferring jurisdiction on Oklahoma.")

*Hagen v. Utah*, 510 U.S. 399, 401–02, 408 (1994) (stating that "Congress has not granted criminal jurisdiction to … Utah to try crimes committed by Indians in Indian country," and therefore, only if the locus of the crime "is not in Indian country" did Utah "properly exercise[] criminal jurisdiction over petitioner, an Indian" (quotation marks omitted))

*United States v. Wheeler*, 435 U.S. 313, 325 n.22 (1978) (describing the Major Crimes Act as a "carefully limited intrusion of federal power into the *otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land*" (emphasis added) (citation omitted))

*Bryan v. Itasca County*, 426 U.S. 373, 379–80 (1976) (explaining that Public Law 280 granted state criminal jurisdiction to certain states in Indian Country because Congress understood that states generally "lack jurisdiction to prosecute Indians" in Indian country (quoting H.R. Rep. No. 83-848, at 5–6 (1953)))

*Rice v. Olson*, 324 U.S. 786, 789 (1945) ("The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832); Act of May 1796, ch. 30, 1 Stat. 469; Act of June 30, 1834, Ch. 161, 4 Stat. 729))

42

*United States v. Kagama*, 118 U.S. 375, 383–85 (1886) (upholding Congress's power to establish criminal jurisdiction over Indians in Indian country where "the offending Indians shall belong to that or some other tribe," and reasoning that this power over Indians "never has existed" in the states and that the federal government "alone" possesses it)

*United States v. Hopson*, 150 F.4th 1290, 1299 (10th Cir. 2025) ("[T]he Supreme Court 'has long 'require[d] a *clear expression* of the intention of Congress' before the state or federal government may try Indians for conduct on their lands.' *McGirt* v. *Oklahoma*, 591 U.S. 894, 929, 140 S. Ct. 2452, 207 L. Ed. 2d 985 (2020) (alteration in original) (emphasis added) (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572, 3 S. Ct. 396, 27 L. Ed. 1030 (1883)); …. The General Crimes Act, 18 U.S.C. § 1152, accords with this historical understanding of tribal independence.")

18 U.S.C. § 1152 (General Crimes Act) ("*This section shall not extend* to offenses committed by one Indian against the person or property of another Indian, nor to *any Indian committing any offense in the Indian country who has been punished by the local law of the tribe*[.]" (emphases added))

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1003–04 (10th Cir. 2015) ("[W]ithin Indian country, generally only the federal government or an Indian tribe may prosecute Indians for criminal offenses…. [And] unless Congress provides an exception to the rule—and it hasn't here—states possess 'no authority' to prosecute Indians for offenses in Indian country.")

*United States v. Sands*, 968 F.2d 1058, 1062 (10th Cir. 1992) ("[T]he United States has consented to States assuming criminal jurisdiction in Indian country, *provided that the Tribe consents*. 25 U.S.C. §§ 1321, 1324. Oklahoma, however, has not taken the affirmative steps necessary for such an assumption of jurisdiction, let alone obtained consent." (emphasis added))

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 3 ("States lack criminal jurisdiction over Indians in Indian country absent congressional authorization[.]"); *see also id*. at 5 (same)

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 6 ("Until Congress chooses otherwise, the prosecution of Indian defendants for conduct in Indian country belongs where it has always belonged: to the sovereigns Congress has authorized.")

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 7 ("*Castro-Huerta* addressed only non-Indian defendants and expressly declined to reach state jurisdiction over Indian defendants. 597 U.S. at 650 n.6. That question remains governed by *McGirt* and *Ute*, which reaffirm that states 'generally have no jurisdiction to try Indians for conduct committed in Indian country' absent a 'clear expression of the intention of Congress.' *McGirt*, 591 U.S. at 898, 929; *Ute*, 790 F.3d at 1004")

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 12 ("*Ute* held that when state or local governments seek to enforce their laws against Indians in Indian Country, 'the presumption and reality are that federal law, federal policy, and federal authority are paramount.' 790 F.3d at 1008–09. That was the law then, and it remains the law now. Where no precedent supports the extension of state or municipal jurisdiction over Indians in Indian Country, this Court will not invent one.… [T]he judiciary does not legislate by impatience, and this Court will not pretend settled precedent is an open question.… The judiciary speaks in precedent, and that precedent could not be clearer.")

Restatement of the Law of American Indians § 71 cmt. b (Mar. 2024 Update) ("Absent federal authorization, states have no jurisdiction over crimes committed by an Indian in Indian country.")

## 9. Under those precedents, Henryetta lacks criminal jurisdiction over *all* Indians, not just MCN citizens.

*McGirt v. Oklahoma*, 591 U.S. 894, 898, 938 (2020) (reversing state conviction of "an enrolled member of the Seminole Nation … [whose] crimes took place on the Creek Reservation")

*Hagen v. Utah*, 510 U.S. 399, 401–02, 408 (1994) (stating that "Congress has not granted criminal jurisdiction to … Utah to try crimes committed by Indians in Indian country," and therefore, only if the locus of the crime "is not in Indian country" did Utah "properly exercise[] criminal jurisdiction over petitioner, an Indian" (quotation marks omitted)); *see also* Petitioner's Brief at 4, *Hagen* (No. 92-6281), 1993 WL 384821, at *4 (specifying that the defendant was an "an enrolled member of the Little Shell Band of Chippewa Indians of Montana" charged with a state crime for conduct on the Ute Reservation)

*United States v. Lara*, 541 U.S. 193, 205 (2004) (observing that the *Duro* fix legislation "involves no interference with the power or authority of any State," and thus demonstrating a clear understanding that states lack criminal jurisdiction over non-member Indians)

*Duro v. Reina*, 495 U.S. 676, 697–698 (1990) (stating that Congress is "the proper body to address" the jurisdictional void created by the Court's holding that tribes may not prosecute non-member Indians, and observing that states already could assume jurisdiction over Indians under Public Law 280 but only *with tribal consent*: "States may, *with the consent of the tribes*, assist in maintaining order on the reservation by punishing minor crime. Congress has provided a mechanism by which the *States now without jurisdiction* in Indian country may assume criminal jurisdiction through Pub.L. 280" (emphases added)); *id.* at 705 n.3 (Brennan, J., dissenting) ("*States do not have* power to exercise criminal jurisdiction over crimes involving Indians on the reservation.… Thus, under the Court's holding today, the tribe, the Federal

Government, and *the State* each lack jurisdiction to prosecute the [non-member Indian] crime involved in this case." (emphases added))

*United States v. Wheeler*, 435 U.S. 313, 325 n.22 (1978) (describing the Major Crimes Act as a "carefully limited intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish *Indians* for crimes committed on Indian land" (emphasis added) (citation omitted))

*Bryan v. Itasca County,* 426 U.S. 373, 379–80 (1976) (explaining that Public Law 280 granted state criminal jurisdiction to certain states in Indian Country because Congress understood that states generally "lack jurisdiction to prosecute *Indians*" in Indian country (emphasis added) (quoting H.R. Rep. No. 83-848, at 5–6 (1953)))

*United States v. Kagama*, 118 U.S. 375, 383–85 (1886) (upholding Congress's power to establish criminal jurisdiction over Indians in Indian country where "the offending Indians shall belong to that *or some other tribe*," and reasoning that this power over Indians "never has existed" in the states and that the federal government "alone" possesses it (emphasis added))

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1003–04 (10th Cir. 2015) ("[W]ithin Indian country, generally only the federal government or an Indian tribe may prosecute *Indians* for criminal offenses…. [And] unless Congress provides an exception to the rule—and it hasn't here—states possess 'no authority' to prosecute *Indians* for offenses in Indian country." (emphases added))

*Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma*, 618 F.2d 665, 668 (10th Cir. 1980) ("States have no authority over *Indians* in Indian Country unless it is expressly conferred by Congress." (emphasis added))

H.R. Rep. No. 102-61, 1991 WL 83785, at *3–4 (1991) ("[T]he states do not have jurisdiction to try Indians for criminal offenses committed within Indian reservations except in those few instances in which Congress has conferred such authority upon them. Thus, *Duro*'s holding that tribes lack criminal jurisdiction over non-member Indians has created a void in the preservation of law and order on many reservations.")

H.R. Rep. No. 101-938, 1990 WL 201576 (1990) (Conf. Rep.) ("[U]nless the Congress acts to fill this jurisdictional void [created by *Duro*], [non-member Indians] … may come onto an Indian reservation, commit a criminal misdemeanor, and know that there is no governmental entity that has the jurisdiction to prosecute them for their criminal acts.")

*Sunnyside Coal Co. v. Director, Office of Workers' Compensation Programs*, 112 F.4th 902, 912–13 (10th Cir. 2024) (stating that "Congress's purpose in passing the law is verified by a Senate [Committee] Report … [that] indicates the Senate's awareness of" what the law sought to address)

45

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 8 ("*McGirt* itself involved a Seminole citizen prosecuted for conduct on Creek land, a non-member Indian, and the Court drew no membership line. 'Indian' means Indian.")

10. **Even if the question of state criminal jurisdiction over Indians in Indian Country were not settled under long-standing precedent, *Bracker* balancing would be inapplicable because it pertains only to assertions of state jurisdiction over *non*-Indians.**

*Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 99 (2005) ("[T]he *Bracker* interest-balancing test applies only where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.'" (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980))

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980) (explaining that "when on-reservation conduct involving only Indians is at issue, state law is generally inapplicable," but "[m]ore difficult questions arise" and "a particularized inquiry into the nature of the state, federal, and tribal interests at stake" is appropriate where "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation")

*McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 179 (1973) ("[W]e reject the suggestion that the *Williams* [balancing] test was meant to apply in this situation. It must be remembered that cases applying the *Williams* test have dealt principally with situations involving non-Indians. *See also Organized Village of Kake v. Egan*, 369 U.S., at 75–76, 82 S. Ct., at 570–571. In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions.")

*Hudson v. Harpe*, No. 23-6181, 2024 WL 262695, at *1 (10th Cir. Jan. 24, 2024) ("Because Mr. Hudson is a member of the Muscogee (Creek) Nation—and therefore, an Indian—*Castro-Huerta* does not apply to this case.")

*Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 823 (10th Cir. 2007) (holding, in a case involving on-reservation Indian conduct, that the Supreme Court's ruling that *Bracker* balancing "applies only" to state jurisdiction over non-Indians "compels our departure from … *Bracker* interest balancing" because "[t]he conduct of non-Indians, whether on- or off-reservation, is not at issue here")

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 7 ("*Castro-Huerta* addressed only non-Indian defendants and expressly declined to reach state jurisdiction over Indian defendants. 597 U.S. at 650 n.6. That question remains governed by *McGirt* and *Ute*, which reaffirm that states 'generally have no jurisdiction to try Indians for conduct committed in Indian country' absent a 'clear expression of the intention of Congress.' *McGirt*, 591 U.S. at 898, 929; *Ute*, 790 F.3d at 1004")

11. **As a matter of constitutional design rather than balancing, states are preempted from asserting jurisdiction over Indians absent congressional authorization.**

*Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (preemption may arise "from … *the Constitution itself*" (emphasis added) (citing *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988))

*Haaland v. Brackeen*, 599 U.S. 255, 272 (2023) ("In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as 'plenary and exclusive.'" (quoting *United States v. Lara*, 541 U.S. 193, 200 (2004)); *id.* at 273–274 (locating the grant of exclusive federal "authority to regulate Indians" in various constitutional provisions and constitutional structure)

*Bryan v. Itasca County*, 426 U.S. 373, 376 n.2 (1976) ("State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." (quoting *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 170–171) (1973))

*United States v. Hopson*, 150 F.4th 1290, 1299 (10th Cir. 2025) ("[T]he Supreme Court 'has long 'require[d] a *clear expression* of the intention of Congress' before the state or federal government may try Indians for conduct on their lands.' *McGirt* v. *Oklahoma*, 591 U.S. 894, 929, 140 S. Ct. 2452, 207 L. Ed. 2d 985 (2020) (alteration in original) (emphasis added) (quoting *Ex parte Crow Dog*, 109 U.S. 556, 572, 3 S. Ct. 396, 27 L. Ed. 1030 (1883)).")

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, 22 F.4th 892, 899–900 (10th Cir. 2022) ("[T]he federal government's plenary and exclusive constitutional authority to legislate in respect to Indian tribes … leav[es] Indians free from state jurisdiction and control." (quotation marks omitted))

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 6 ("[C]riminal jurisdiction over Indians is exclusive by constitutional design, not balance. Sovereignty … is a constitutional boundary.")

12. **Judicial balancing would be especially inappropriate here, where Congress has clearly determined that States cannot extend jurisdiction over Indians in Indian country absent tribal consent.**

*Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 803 (2014) (stating that courts should not "replace Congress's considered judgment" with their own because "[j]udicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law" (citation omitted))

*Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328, 360 (2008) (Scalia, J., concurring in part) (criticizing judicial balancing tests in general and admonishing courts to "leave these quintessentially legislative judgments with the branch to which the Constitution assigns them")

25 U.S.C. § 1301(2) ("*Duro* Fix" provision choosing to fill the jurisdictional void created by *Duro* by reaffirming "the inherent power of Indian tribes … to exercise criminal jurisdiction over all Indians" rather than by authorizing state jurisdiction over non-member Indians in Indian Country)

H.R. Conf. Rep. No. 102-261, 1991 WL 218024, at *3–5 (1991) (explaining that *Duro* created a "jurisdictional void" and supporting fix "reaffirm[ing] the inherent authority of tribal governments to exercise criminal jurisdiction over all Indians on their reservations," rather than authorizing state jurisdiction); *id.* at *6 ("The Committee of the Conference fully recognizes that *the tribal court is the best forum to handle misdemeanor cases over non-member Indians* and chaos would result were tribes to lose this long held jurisdictional authority. The Committee of the Conference reaffirms the inherent authority of tribal governments to exercise criminal jurisdiction over all Indians on their reservations." (emphasis added))

*Duro v. Reina*, 495 U.S. 676, 698 (1990) (observing that Congress is "the proper body to address" a jurisdictional void over non-member Indians in Indian country)

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 879 (1986) (explaining that "[as] originally enacted, Pub.L. 280 did not require the States to obtain the consent of affected Indian tribes before assuming jurisdiction over them," but that in 1968 Congress amended the statute "to require that all subsequent [state] assertions of jurisdiction be preceded by tribal consent. Pub.L.90 Pub.L. 90–284, §§ 401, 402, 406, 82 Stat. 78–80, codified at 25 U.S.C. §§ 1321, 1322, 1326"); *id.* at 887 (explaining that in adopting the 1968 amendments to Public Law 280, "Congress was motivated by a desire to shield the Indians from unwanted extensions of jurisdiction over them" in light of its concern for "tribal sovereignty and self-government."); *id.* ("We have previously enforced the procedural requirements and the jurisdictional provisions of Pub.L.280 quite stringently, consistent with our understanding that the jurisdictional scheme embodied in that Act was the product of a wide-ranging and detailed congressional study.")

Act of Apr. 11, 1968, Pub. L. No. 90-284, § 401(a), 82 Stat. 73-92 (codified at 25 U.S.C. § 1321(a)(1)) ("The consent of the United States is hereby given to any State not having jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, *with the consent of the Indian tribe occupying the particular Indian country* or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any

48

such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State." (emphasis added))

Act of Apr. 11, 1968, Pub. L. No. 90-284, § 406, 82 Stat. 73-92 (codified at 25 U.S.C. § 1326) ("*State jurisdiction* acquired pursuant to this subchapter with respect to criminal offenses or civil causes of action, or with respect to both, *shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians* voting at a special election held for that purpose." (emphases added))

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 8 ("Congress, not the City, controls where state power ends.")

## IRREPARABLE HARM

13. **Henryetta's unauthorized policing and prosecution of Indians within the Nation's Reservation constitute an invasion of the Nation's sovereignty and accordingly inflict irreparable injury on it.**

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) ("The Tenth Circuit has 'repeatedly stated that … an invasion of tribal sovereignty can constitute irreparable injury.'… Indeed, the harm to tribal sovereignty in this case is perhaps as serious as any to come our way in a long time." (quoting *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006)))

*Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006) ("The district court held that there was irreparable injury because the State Defendants impermissibly intruded on the Wyandotte's sovereignty by enforcing state law on Indian land. We have repeatedly stated that such an invasion of tribal sovereignty can constitute irreparable injury.")

*United States v. Lara*, 541 U.S. 193, 199, 210 (2004) (holding that in adopting 25 U.S.C. § 1301(2) (the "*Duro* Fix" legislation), Congress recognized and affirmed that tribes' inherent sovereign power includes the power to exercise criminal jurisdiction over all Indians including non-member Indians)

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 3 ("[S]tate and local officials inflict a sovereign injury when they prosecute Indians for conduct occurring in Indian country[.]")

*Supra* MCN Proposed Findings of Fact 27–32, 42–43 (citing evidence and testimony regarding the Nation's approach to the exercise of its inherent criminal jurisdiction and detailing how Henryetta's unilateral assertion of police and prosecutorial power over Indians interferes in significant practical ways with that exercise of sovereign tribal authority)

## BALANCE OF HARMS AND THE PUBLIC INTEREST

14. **The Nation has highly significant self-governance interests in developing and strengthening its sovereign institutions and applying its own laws and policies to Indians within the Reservation.**

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1007 (10th Cir. 2015) ("That brings us to the last two elements of the preliminary injunction test: a comparison of the potential harms that would result with and without the injunction and a consideration of public policy interests. *Prairie Band*, 253 F.3d at 1250. Here again there's no question who has the better of it. On the Tribe's side of the ledger lies what this court has described as the 'paramount federal policy' of ensuring that Indians do not suffer interference with their efforts to 'develop … strong self-government.' *Seneca-Cayuga Tribe v. Oklahoma ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir.1989); *see also Prairie Band*, 253 F.3d at 1253." (ellipsis in original))

*Supra* MCN Proposed Findings of Fact 3–32, 42–43 (citing evidence and testimony regarding: the Nation's investment in its police, prosecutors, and court system; the effectiveness of those criminal justice institutions in protecting public safety; how those institutions exercise criminal jurisdiction in a manner consistent with the Nation's values and priorities; and how Henryetta's unilateral assertion of police and prosecutorial power over Indians interferes in significant practical ways with that sovereignty)

15. **Henryetta's countervailing concerns are due no weight because: Henryetta's exercise of criminal jurisdiction over Indians is not necessary to protect public safety; any negative consequences of not entering a cross-deputization agreement amount to self-inflicted harm; and Henryetta has no entitlement to exercise jurisdiction over Indians in the first place.**

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1007 (10th Cir. 2015) ("Against this [tribal interest], the State and Wasatch County argue an injunction would impede their ability to ensure safety on public rights-of-way. But this concern 'is not as portentous as [they] would have it.' *Prairie Band*, 253 F.3d at 1253. It isn't because nothing in the requested temporary injunction would prevent the State and County from patrolling roads like the ones on which Ms. Jenkins was stopped, from stopping motorists suspected of traffic offenses to verify their tribal membership status, from ticketing and prosecuting non-Indians for offenses committed on those roads, from referring suspected offenses by Indians to tribal law enforcement, or from adjudicating disputes over the Indian status of accused traffic offenders when meaningful reasons exist to question that status. Instead, the temporary injunction would simply prohibit the State and County from prosecuting Ms. Jenkins and perhaps other tribal members for offenses in Indian country—

50

something they have no legal entitlement to do in the first place. In this light, the defendants' claims to injury should an injunction issue shrink to all but 'the vanishing point.' *Seneca-Cayuga*, 874 F.2d at 716." (brackets in original))

*Heartland Animal Clinic, P.A. v. Heartland SPCA Animal Medical Center, LLC*, 503 F. App'x 616, 623 (10th Cir. 2012) ("[S]elf-inflicted harm can weigh in favor of granting a preliminary injunction.")

*Sonic Industries LLC v. Olympia Cascade Drive Ins LLC*, Case No. CIV-22-449, 2022 WL 3654748, at *7 (W.D. Okla. Aug. 24, 2022) ("[C]ourts afford little weight to self-inflicted harms when conducting the balancing inquiry." (citation omitted))

Opinion and Order Denying the Motion to Dismiss (Dkt. 73) at 12–13 ("Public safety is not imperiled by fidelity to the law. When governments invoke fear to defend power, the Court's duty is to separate the echo from the evidence. Here, only the echo remains. Budgetary consequences do not expand jurisdiction. The Constitution does not bend to convenience.")

*Supra* MCN Proposed Conclusions of Law 6–12 (establishing that Henryetta lacks a legal right to exercise criminal jurisdiction over Indians in Indian country)

*Supra* MCN Proposed Findings of Fact 3–26, 33–40 (citing evidence and testimony regarding: the effectiveness of the Nation's criminal justice institutions in protecting public safety; the ability of the Nation and Henryetta to protect public safety in Henryetta without Henryetta unilaterally asserting criminal jurisdiction over Indians; and how Henryetta's assertions of criminal jurisdiction over Indians have not served the interest of public safety)

*Supra* MCN Proposed Findings of Fact 11–19, 36 (citing evidence and testimony regarding: Lighthorse's collaborative relationships with other law enforcement agencies; the effectiveness of the Nation's cross-deputization agreements in promoting public safety; and the Nation's willingness, and Henryetta's refusal, to enter a cross-deputization agreement on the same terms that the Nation has with sixty-four other law enforcement agencies on the Reservation)

Dated: December 22, 2025

Respectfully submitted,

*/s/ Riyaz A. Kanji*

Geraldine Wisner, OBA No. 20128
Deputy Attorney General
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447
(918) 295-9720
gwisner@mcnag.com

Riyaz A. Kanji
David A. Giampetroni
Joshua C. Handelsman
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400
rkanji@kanjikatzen.com
dgiampetroni@kanjikatzen.com
jhandelsman@kanjikatzen.com

O. Joseph Williams, OBA No. 19256
O. JOSEPH WILLIAMS LAW OFFICE, PLLC
The McCulloch Building
114 N. Grand Avenue, Suite 520
P.O. Box 1131
Okmulgee, OK 74447
(918) 752-0020
jwilliams@williamslaw-pllc.com

Philip H. Tinker, OBA No. 36498
KANJI & KATZEN, P.L.L.C.
12 N. Cheyenne Ave., Ste. 220
Tulsa, OK 74103
(206) 344-8100
ptinker@kanjikatzen.com

*Counsel for Muscogee (Creek) Nation*

52

**CERTIFICATE OF SERVICE**

I certify that on December 22, 2025, this document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ *Riyaz A. Kanji*
Riyaz A. Kanji